**James R. BAKER, Plaintiff-Appellant,**

v.

**The PENN MUTUAL LIFE**
**INSURANCE COMPANY,**
**Defendant-Appellee.**

No. 84–1412.

United States Court of Appeals,
Tenth Circuit.

April 2, 1986.

---

Jeffrey L. Willis, Minter & Willis, Wichita, Kan. (Frank W. Visciano and Karl J. Geil, Vranesic & Visciano, Denver, Colo., with him also on briefs), for plaintiff-appellant.

Gary L. Ayers, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan. (Robert L. Howard of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., with him also on brief), for defendant-appellee.

Before BARRETT and ANDERSON, Circuit Judges, and COOK, District Judge.[*]

ANDERSON, Circuit Judge

James R. Baker, a former general agent of the Pennsylvania Mutual Life Insurance Co. ("Penn Mutual" or "company") brought suit against Penn Mutual in federal court, based on diversity jurisdiction, alleging, *inter alia*, that Penn Mutual wrongfully terminated him as a general agent; deprived him, after termination, of deferred commissions and other sums; and failed to reimburse him for expenditures which he made on behalf of Penn Mutual while serving as its general agent. Two and one-half years after the suit was commenced, and after discovery had been conducted by both parties, the District Court for the District of Kansas granted Penn Mutual's motion for summary judgment, dismissing twelve of the thirteen "causes of action" in plaintiff's complaint, and subsequently denied plaintiff's motion to alter or amend that judgment. Plaintiff appeals from the district court's orders on only five of the twelve causes of action (supplemented by additional theories raised outside the complaint), involving issues of wrongful termination, deferred commissions, rescission of contract, and tortious conversion. For the reasons stated in this opinion, we agree with and affirm the judgment of the district court.

In reviewing the district court's grant of summary judgment, we must view the case in the same manner as did that court. *See Gomez v. American Electric Power Service Corp.*, 726 F.2d 649, 651 (10th Cir.1984); *Western Casualty & Surety Co. v. National Union Fire Insurance Co.*, 677 F.2d 789, 791 n. 1 (10th Cir.1982); *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.1980). Thus, we must determine whether any genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. *See* Fed.R.Civ.P. 56(c); *Western Casualty*, 677 F.2d at 791 n. 1. In doing so, we must view the record in the light most favorable to the party opposing the motion. *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981). Conclusory allegations, however, do not establish an issue of fact under Rule 56. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980); *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442, 445 (10th Cir.1976); *Bumgarner v. Joe Brown Co.*, 376 F.2d 749, 750 (10th Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 99, 19 L.Ed.2d 90 (1967).

## BACKGROUND

Prior to the termination of his relationship with Penn Mutual in 1979, plaintiff served that company for more than twenty-one years, and by many standards he was considered a leader and top performer. He began as a soliciting agent on June 6, 1958, and was granted general agent status on June 1, 1965, when he took over the company's general agency in Wichita, Kansas.

Plaintiff rendered his services pursuant to written contracts, the first being his "Soliciting Agent's Contract", then the General Agency Contract dated June 1, 1965, with subsequent written amendments (the "1965 Contract"), and finally, the General Agency Contract, effective July 1, 1975 (the "1975 Contract"), which replaced the 1965 Contract, and which is the subject

---

[*] Honorable H. Dale Cook, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

of this suit. There were two written amendments to the 1975 Contract, "Amendment 76-1 to General Agency Contract", dated December 23, 1975, and the "Premium Finance Plan", dated February 1, 1979.

The general agency contracts imposed numerous obligations upon plaintiff, resulting in the expenditure by him of substantial sums of money (asserted to have totaled $490,660) for office rental, supplies, equipment, clerical salaries, and other items directly related to the promotion of the business. They also conferred benefits in the form of various allowances and, in general, commissions on initial and renewal premiums paid on policies sold by him as well as on those sold through his agency by agents which he recruited and trained. Subject to time periods and conditions set forth in the contracts, the expectation of continuing commissions from renewal premiums, referred to in the industry as "renewals" or "vestings", constituted an important part of plaintiff's compensation, amounting to hundreds of thousands of dollars over the years, and were regarded by plaintiff as a form of retirement plan.

The parties apparently conducted business under their 1965 Contract without complaint material to this action, except for some criticism by the company of occasional cash flow problems in plaintiff's agency. At his deposition, plaintiff testified that to his knowledge Penn Mutual had complied with the terms of the 1965 Contract.

In 1975 the company introduced a new General Agency Contract which in form closely followed the 1965 Contract, but with significant differences in commission schedules. Plaintiff signed the new contract after representatives of the company told him that it was "designed to produce greater income" and "should assist" his business. When increased income did not result within several months plaintiff complained, but was told that if he "continued to follow company policy and sell insurance" he would "prosper in the long run." He apparently expressed no further formal dissatisfaction over his income until after his termination in 1979; and, on December 23, 1975, plaintiff executed a written contract amendment which contained an express ratification and confirmation of the terms of the 1975 Contract, as amended. After the 1975 Contract was in effect, plaintiff relates that he was told on various unspecified occasions by two Penn Mutual officials, George Bennington and James Hance, that: "So long as I performed in the area of sales production that I would be paid for that job and the company would take care of me."

Financial difficulties began to plague plaintiff in 1978 when the cost of building a new house ballooned from original estimates of $227,500 to approximately $400,000, necessitating both refinancing and the assumption of more debt than originally planned. Part of the refinancing, amounting to $245,000, was loaned by Penn Mutual to plaintiff under the company's MAPS program. That loan was made on the recommendation of John Tait, a company official who visited plaintiff in February, 1979, and who encouraged plaintiff to complete the construction of his residence in the cost range estimated by plaintiff at $400,000. By July 1979, it became apparent to plaintiff that an additional $50,000 would still be needed. When the company did not respond to his request for an increased loan, he telephoned Mr. Robert Purcifull, Penn Mutual's President, and among other things requested that he be allowed to use $50,000 of company funds flowing through his agency, to complete his residence. On plaintiff's understanding that such permission was granted, he proceeded to use agency funds in the requested amount and communicated that fact and the substance of his telephone call with Mr. Purcifull to other Penn Mutual officials.

The 1975 Contract between the parties contained a termination clause which permitted either party to terminate the agreement upon sixty days notice to the other, and provided for termination in event of death, incapacity, retirement or resignation. The clause also permitted termination by Penn Mutual at any time for "cause," as defined in the contract. In the

event of termination for cause the contract provided for forfeiture of vestings.

The termination provisions were invoked by Penn Mutual on October 16, 1979, when plaintiff was summoned to a meeting at company headquarters and issued the ultimatum that he could either voluntarily terminate his relationship with the company under the sixty day termination provision, or the company would instantly terminate him for cause. Company representatives gave as a reason that plaintiff had violated company rules and bonding company requirements by using for personal purposes $50,000 of company money in the construction of his new home.

Since plaintiff believed he had permission to borrow the $50,000, he disputed the reason given for the termination ultimatum. Nevertheless, he felt coerced into giving his sixty day notice of termination because he faced the possible loss of his accumulated vestings if he was terminated for cause. Plaintiff thereafter handed in his written contract termination notice, effective December 31, 1979.

Two of the counts in plaintiff's complaint concern matters which occurred after his termination. The first arose after Penn Mutual collected $4,802.12 from plaintiff on his guaranty of indebtedness evidenced by certain premium finance agreements executed under the company's Premium Finance Plan. Under that plan the company agreed to finance qualifying premiums if the general agent signed as a guarantor on a specified number of policies. If that guaranty was called upon, the general agent was subrogated to Penn Mutual's rights in the premium finance agreement, and if Penn Mutual received payment in full it agreed to assign and transfer to the general agent all of its rights in that agreement. However, in plaintiff's case no such assignment was made by Penn Mutual, or requested by plaintiff, until after this suit was filed. In the interim, no attempts were made by plaintiff to collect from the principal obligors, and the statute of limitations ran on his right to do so.

The second post-termination occurrence complained of by plaintiff relates to Penn Mutual's introduction of a new insurance policy named the "Independence Builder." That policy was the company's version of what is commonly known as "universal life insurance" and was intended to compete with similar products being offered in the marketplace by other companies. Problems developed for plaintiff when his successor general agent sold Independence Builder policies to individuals holding whole life policies sold by plaintiff. The whole life policies were allowed by policyholders to lapse in favor of the newer product, resulting in a diminution of plaintiff's vestings.

Plaintiff commenced this suit on March 11, 1981, naming both Penn Mutual and certain of its officers as defendants. Subsequently, the complaint was dismissed as to the individual defendants. On December 10, 1982, plaintiff filed an "Amended Petition," and on April 5, 1983, Penn Mutual filed its Motion for Summary Judgment. On May 9, 1983, the plaintiff responded to the Motion for Summary Judgment; on October 11, 1983, the court entered its Memorandum and Order granting summary judgment in favor of Penn Mutual on all causes of action with the exception of the eighth cause of action; and it left Penn Mutual's counterclaim intact. Subsequently, plaintiff filed a Motion to Alter or Amend the Judgment and on February 28, 1984, that motion was denied. This appeal followed.

The parties agree that Kansas law controls the disposition of the issues raised in this case. On those issues where we have been unable to find Kansas authorities on point, we have construed the law as we believe the Supreme Court of Kansas would have if faced with the same facts and issues. *See Hartford v. Gibbons & Reed Co.*, 617 F.2d 567, 569 (10th Cir.1980); *City of Aurora, Colorado v. Bechtel Corporation*, 599 F.2d 382, 386 (10th Cir.1979).

I

WRONGFUL TERMINATION ISSUE

■ The 1975 contract between plaintiff and Penn Mutual expressly permitted ter-

mination of the relationship by either party at any time, without cause, upon sixty days written notice.[1] Ordinarily, there would be no liability for termination of a general agency contract pursuant to such a provision, regardless of the motive.[2] However, plaintiff contends the termination provisions were either orally modified, or should have been restricted for various public policy or equitable reasons to permit termination only for good cause. He further contends that Penn Mutual tortiously coerced him to terminate, and that by its tactics Penn Mutual failed in any event to comply with the provisions governing termination.

■ We entertain plaintiff's oral modification argument only upon the exercise of our discretion. It was not pleaded in the original complaint or in plaintiff's "Amended Petition", filed twenty-one months later, and was not pursued during discovery. The argument was raised formally for the first time in plaintiff's response to Penn Mutual's motion for summary judgment. That response, filed twenty-six months after commencement of this suit, was unaccompanied either by a motion to amend the pleadings or by reasons justifying an amendment. Under the circumstances, the district court would have been well within its discretion to exclude the oral modification argument entirely. *See Leaseamerican Corp. v. Eckel,* 710 F.2d 1470, 1473 (10th Cir.1983); *see also Ross v. Houston Independent School District,* 699 F.2d 218, 229 (5th Cir.1983); *Poe v. John Deere Co.,* 695 F.2d 1103, 1107 (8th Cir.1982); *Mende v. Dun & Bradstreet, Inc.,* 670 F.2d 129, 131 (9th Cir.1982). However, the court elected to address the issue, and we do so as well in order to put it to rest. *See Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Pell v. Azar Nut Co.,* 711 F.2d 949, 950 (10th Cir.1983).

■ Plaintiff's only direct evidence in support of an alleged oral modification is contained in a single paragraph in his own affidavit, in which he states, without identifying time, place or circumstances:

"7. George Bennington, on behalf of the company, and James Hance on behalf of the company continually told me that so long as I performed in the area of sales production that I would be paid for that job and the company would take care of me." (R. Vol. I, at 210)[3]

We agree with the district court's characterization of the alleged communications as vague utterances. Under Kansas law, as elsewhere, a modification of a contract is in itself a contract, and must be supported by consideration. *See Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.,* 227 Kan. 469, 474, 608 P.2d 890, 894 (1980); *Frogge v. Belford,* 168 Kan. 74, 78, 211 P.2d 49, 52 (1949). The quoted language identifies no new consideration, referring only to what the plaintiff was already obligated to do under his contract with Penn Mutual. There is no indication that the parties bargained or had a meeting of the

---

1. "9. TERMINATION OF APPOINTMENT. Penn Mutual or General Agent may terminate this agreement upon sixty days' written notice to the other, and Penn Mutual may, for cause, terminate this agreement immediately by giving written notice to General Agent. Misappropriation of funds or property of Penn Mutual or of funds received for it, failure to remit to Penn Mutual funds due it, commission of any dishonest or fraudulent act, or refusal or failure to comply with Penn Mutual's rules and regulations shall be cause for termination. Termination of this agreement shall terminate General Agent's appointment hereunder. If not sooner terminated as provided above, this agreement shall terminate upon the occurrence of the earliest of the following events: resignation of General Agent; incapacity of General Agent, as determined by Penn Mutual, to discharge his duties under this agreement; death of General Agent; expiration of the month in which General Agent becomes 65; withdrawal by Penn Mutual from territory of General Agent." (R. Vol. I, at 94)

2. *See Sterling Colorado Agency, Inc. v. Sterling Ins. Co.,* 266 F.2d 472, 474–77 (10th Cir.1959); *Newcomb v. Imperial Life Ins. Co.,* 51 F. 725, 726–27 (C.C.Mo.1892). *See generally,* Annot., 5 A.L.R. 4th, 1111–1120 (1981); 3 *G. Couch, Couch on Insurance 2d* 26:39, at 580 (1984).

3. Mr. Bennington retired from Penn Mutual in May, 1976. Plaintiff took the deposition of James Hance, but asked no questions of him on the subject of the alleged oral modification.

minds. And, from a contract standpoint the language is deficient on its face. The terms of an alleged contract amendment, including identification of written provisions being modified, are completely absent, leaving a trier of fact impermissibly to create, from speculation, all of the missing terms and conditions. Furthermore, the fact that plaintiff and Penn Mutual executed two detailed written amendments to their 1975 contract[4] during the time when the alleged oral modification was supposedly occurring suggests that plaintiff, an insurance broker experienced in the importance of written contracts, had no basis upon which to believe that his 1975 contract had been orally amended.

In the alternative plaintiff argues that once Penn Mutual's representatives made the encouraging expressions quoted above, and perhaps in any event, Penn Mutual's contractual right to terminate him was restricted by considerations of public policy, equity, estoppel, implied amendment, and covenants of good faith and fair dealing, to termination only for good cause. That cluster of arguments is supported by plaintiff's citation of a minority line of cases, from states other than Kansas, dealing with the law of master-servant. *Rawson v. Sears, Roebuck & Co.*, 530 F.Supp. 776 (D.Colo.1982); *Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Monge v. Beebe Rubber Company*, 114 N.H. 130, 316 A.2d 549 (1974). However, even assuming plaintiff's "employee" thesis, the cited cases are easily distinguishable on a number of grounds, the most obvious of which is the absence of a written contract expressing the agreement of the parties as to termination; moreover, those cases do not reflect Kansas law. Kansas follows the general rule, stated in 53 Am.Jur.2d, Master and Servant, § 43

(1970), quoted in *Lorson v. Falcon Coach, Inc.*, 214 Kan. 670, 522 P.2d 449, 457 (1974):

"When the employment is not for a definite term and there is no contractual or statutory restriction upon the right of discharge, an employer may lawfully discharge an employee whenever and for whatever cause he chooses, without incurring liability...."

*See also Mildfelt v. Lair*, 221 Kan. 557, 561 P.2d 805 (1977); *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976); *Johnston v. Farmers Alliance Mutual Insurance Co.*, 218 Kan. 543, 545 P.2d 312, 315 (1976); *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 370 P.2d 390 (1962); *Swart v. Huston*, 154 Kan. 182, 117 P.2d 576, 579–80 (1941); *Cussimanio v. Kansas City Southern Ry. Co.*, 5 Kan.App.2d 379, 382–83, 617 P.2d 107, 112 (1980); *Annot.*, 12 ALR 4th 544 (1982).

Plaintiff argues that if squarely presented with the issue, Kansas courts would countenance an exception on public policy grounds, restricting discharge to good cause where alleged assurances of continuing employment had been given. The opposite appears to be true. In *Johnson v. National Beef Packing Co.*, 551 P.2d 779, a case where no written contract governed the employment in question, the Kansas Supreme Court found that a company policy manual containing the statement "no employee shall be dismissed without just cause," plus a company advertisement stating "this is not seasonal employment," and an oral commitment to the employee that he would become a "permanent employee" after ninety days, created no contract, either express or implied, between company and employee, and imposed no restriction on the company's right to terminate the employee. *See Rouse v. Peoples Natural Gas Co.*, 605 F.Supp. 230 (D.Kan. 1985) (and cases cited therein). It is hardly likely that the same court would imply a restriction on termination, based on similar oral statements, where the parties had

---

**4.** "Premium Finance Plan" dated February 1, 1979, (R. Vol. I, at 111), and "Amendment 76–1 to General Agency Contract" dated December 23, 1975 (R. Vol. I, at 113).

agreed otherwise in an express written contract.

■ Finally, plaintiff contends that Penn Mutual did not comply with the termination provisions of the contract. He reasons that his letter of termination should be disregarded because it was coerced, and since Penn Mutual did not send its own sixty day written notice of termination to plaintiff, the termination provisions were never activated. We disagree. The fundamental fact of this matter is that plaintiff himself chose to execute and deliver a sixty day notice of contract termination. That he felt pressured to do so, due to the threatened alternative, there can be no doubt. However, plaintiff's reasoning breaks down at that point. If Penn Mutual had no cause to terminate him for misuse of company funds, as plaintiff earnestly contends, he had the option of refusing to initiate termination and forcing the issue with Penn Mutual, including suit, to vindicate himself. If the alleged "cause" existed, then plaintiff cannot complain that he was allowed to choose the more lenient alternative of termination upon sixty days notice in order to preserve his vestings.

■ In any event, even assuming, *arguendo,* plaintiff's point that his act of termination should be disregarded because it was involuntary, termination still occurred. The essence of the termination clause was the ability to effect a termination which was involuntary as to the other party to the contract. The result and the essential characteristic of involuntariness on plaintiff's part are identical regardless of whether plaintiff was coerced to terminate under the sixty day termination provision of the 1975 contract, or was terminated involuntarily by Penn Mutual. If plaintiff's hand was guided by duress, then the hand that acted was that of Penn Mutual, doing indirectly what it was entitled to do directly, and an examination of its motive in choosing that method is irrelevant. As stated by the district court, "plaintiff cannot have been injured by defendant accomplishing through coercion what it might have done outright with impunity." Likewise, the requirement of written notice was satisfied by plaintiff's own hand, voluntarily on his own behalf, or involuntarily on Penn Mutual's behalf, in either event triggering the sixty day termination clause. The purpose of the written notice provision was to establish, with the certainty required of written instruments, that termination had occurred, and the exact dates constituting the sixty-day period. Here, there was no doubt in plaintiff's mind that his relationship with Penn Mutual was in fact severed, and he fixed the sixty day time period himself. Therefore, the mechanical requirements of the termination provision were effectively satisfied.

In summary, the district court was correct in holding that plaintiff has raised no genuine issue as to any material fact on the claim of wrongful termination, and the court's holding in that regard is affirmed.

## II

### CLAIM FOR VESTINGS

Under his contract with Penn Mutual, plaintiff was compensated for the sale of insurance policies through his agency by a commission on the initial and subsequent renewal premiums paid by policyholders. That right to vestings extended beyond termination of plaintiff's contract, subject to certain conditions. But if insureds died or let their policies lapse for one reason or another, plaintiff's income from vestings would diminish accordingly.

Plaintiff's contention is that Penn Mutual wrongfully caused or failed to prevent an abnormal decline in his vestings following termination or, in the alternative, wrongfully failed to attach his vestings to a new product, claimed by plaintiff to be a replacement for lapsed policies originally credited to him. He presses his contention on a variety of theories: a duty by Penn Mutual to plaintiff as third party beneficiary of Penn Mutual's contract with successor general agents, requiring servicing of existing policies; a direct, affirmative contractual duty by Penn Mutual to plaintiff, under their former contract, to pre-

serve in force policies credited to plaintiff's vestings; a right to have his vestings transferred and attach to the new "Independence Builder" insurance policy which many policyholders purchased, letting their old whole life policies lapse; a separate, affirmative duty by Penn Mutual, arising by way of estoppel, created by its conduct in one previous instance, to compensate agents for the loss of vestings due to the introduction of a new product; and a breach of plaintiff's former contract with Penn Mutual, as orally modified.[5]

The issue is not as complex as plaintiff's theories would make it. And, although there does not appear to be Kansas law directly on the subject, we believe the rule there would be consistent with the following views and authorities.

■ Plaintiff's right to vestings exists solely because of and is circumscribed by his contract with Penn Mutual, which is the reference point for determining the rights and duties of the parties. *See, e.g., Roush v. National Old Line Insurance Co.,* 453 F.Supp. 247, 252 (W.D.Okla.1978); *Massachusetts Mutual Life Insurance Co. v. Central Penn Nat. Bank,* 372 F.Supp. 1027 (E.D.Pa.1974); *Geiss v. Northern Insurance Agency,* 153 N.W.2d 688, 690 (N.D.1967). *See also* 4 G. Couch, *Couch on Insurance,* 26A:231 at 442; 43 Am. Jur.2d Insurance §§ 146 at 230–231; 152–54 at 236–239. Paragraph 11 of the contract ("Compensation After Termination Of

Appointment"), as amended, provides by reference to other subsections[6] that after termination plaintiff's vestings consist of commissions on "premiums paid on *policies placed in force* after the effective date of this agreement *by general agent....*" (emphasis supplied).

■ There is no contention here that the "Independence Builder" policies the purchase of which plaintiff blames for the lapse of some whole life policies in his pool of vestings were "policies placed in force" during plaintiff's tenure, as required by the contract. Nor can they properly be characterized as replacements for such policies in the sense that they were issued as substitutes for existing whole life policies, since both products coexisted in the market and among Penn Mutual insureds. Indeed, Penn Mutual adopted reduced commissions on its universal life product to discourage its agents from selling that product to holders of Penn Mutual whole life policies, as plaintiff concedes. Accordingly, under the unambiguous terms of his contract plaintiff is not entitled to vestings on any Independence Builder policies on the theory of replacement.

Plaintiff argues for various affirmative duties to be placed upon Penn Mutual with respect to protecting his vestings,[7] but the contract between them imposed no such duties. In *Sterling Colorado Agency, Inc. v. Sterling Insurance Co.,* 266 F.2d 472,

---

**5.** As originally pleaded, plaintiff relied solely upon theories of breach of fiduciary duty and negligence, but has since dropped those theories. In a companion lawsuit, *Southwest National Bank v. Penn Mutual Life Insurance Company,* No. 82–1392 (D.Kan. December 27, 1982) (Memorandum and Order), the district court has already held that those theories fail to state a claim upon which relief can be granted.

**6.** "Amendment 76–1 to General Agency Contract" dated December 23, 1975, amended the compensation provisions in certain respects not material to this point.

**7.** The affirmative duty argument is in any event inconsistent with representations made by plaintiff's counsel to the district court where counsel stated:

"MR. WILLIS: Judge, on the issue of converting the policies to the universal life, the

reason we brought that to the Court's attention is the fact that the contract provides that he is to be remunerated after termination as provided for by the contracts. Assuming it stands in place, the question is what can the company do or not do in regard to maintaining those policies?

Now in our original suit, which was *Southwest versus Penn Mutual,* and ruled on by Judge Crow, it was the plaintiff's contention in that case that the Penn Mutual has some affirmative duty to keep those policies in force. I believe Judge Crow did correctly find that they have no duty to guarantee those policies and stay on the books." (Transcript of Proceedings of plaintiff's Motion to Amend or Alter Judgment, December 5, 1983, R. Vol. IX, at 23).

474 (10th Cir.1959) we described an insurer's obligations to its selling agency as follows:

> "It is true that an insurer cannot by arbitrary action cancel a policy *to prevent collection of renewal premiums by the Agent, Ensign v. United Pacific Ins. Co.*, 107 Utah 557, 155 P.2d 965 [ (1945) ]; *Newcomb v. Imperial Life Ins. Co.*, C.C. Mo., 51 F. 725; or to force the agent to accede to improper demands, *O'Brien Inc. v. Vehicle Underwriting Agency Corp.*, 12 N.J.Misc. 815, 175 A. 256 [ (1934) ], *or otherwise interfere in business which it has promised the agent in order to defeat his rights.* Such activities have been found to be violative of the implied covenant of good faith between the principal and agent. But we have been referred to no case, nor can we find one, where an agent has been allowed recovery for loss occasioned by bad faith between underwriter and policyholder. Absent a specific contract provision, the agent has no voice in the settlement of policy claims. He is not a third party beneficiary under the policy nor in direct privity through the insuring contract. He must recover on his own contract, if at all, and *the implied promise of good faith dealing on that contract does not preclude the insurer from contracting with third parties according to its judgment of business interests.* The company having done just that, albeit in bad faith to its policyholders, is answerable only to the policyholders. The trial court was correct in so holding." (emphasis added).

■ There is a significant difference between a diminution of plaintiff's vestings due to action by Penn Mutual intended to cause that result, and diminution as an unfortunate by-product of the competitive conduct of business by Penn Mutual in the marketplace, in the ordinary course, for the benefit of its existing and potential insureds, and in the exercise of its own business judgment. Penn Mutual's duty to plaintiff is confined to the former, and does not extend to the latter contingency.

■ Plaintiff's remaining two arguments are likewise without merit. Penn Mutual's compensation of agents for an expected loss of renewals in another situation was a mere gratutity and did not create, by estoppel, implied contract amendment, or otherwise, any obligation to do so in other instances. And, in our discussion of the wrongful termination issue we have already found that there was no oral modification of plaintiff's contract.

In summary, plaintiff has raised no genuine issue of any material fact on the subject of vestings, and the district court's judgment to that effect is affirmed.

### III

### CLAIM FOR RESCISSION

On the theory that he was an employee of Penn Mutual, rather than an independent contractor, plaintiff in his second and fifth causes of action sought reimbursement of expenses paid by him in the operation of his agency.[8] In its motion for summary judgment Penn Mutual argued that plaintiff's status was irrelevant since the rights and obligations of the parties were defined and governed by a written contract, a position adopted by the district court. In response, plaintiff altered his position and for the first time argued that he was entitled to a rescission of the 1975 Contract. On appeal, plaintiff relies exclusively on that theory, which has never been incorporated in his complaint. Because the district court addressed the issue of rescission in the exercise of its discretion,[9] we elect to do so here. *See Singleton v.*

---

8. The amounts referred to in the fifth cause of action were offset by Penn Mutual against compensation due plaintiff, as permitted by the 1975 Contract.

9. Contrary to plaintiff's assertion that the district court failed to make required findings on the issue, the court clearly set forth its finding that the alleged "mistakes" advanced to support rescission were mere expectations, a finding which we adopt here.

*Wulff,* 428 U.S. at 121, 96 S.Ct. at 2877; *Pell v. Azar Nut Co.,* 711 F.2d at 950.

At the outset, we note that plaintiff's claim for rescission is inconsistent with other claims for relief urged by plaintiff which are based upon his 1975 Contract with Penn Mutual. And, in asserting the claim for rescission, plaintiff does not explore the subject of income which he received under the contract, both before and after termination, or the subject of restoration of the status quo. We also note the absence of any authority directly on point cited by plaintiff in support of his argument.

Plaintiff's asserted ground for rescission is mutual mistake of fact, or a misrepresentation of fact by the company at the time the contract was presented for execution. The alleged mistake or misrepresentation was that plaintiff would make more money under the 1975 Contract than he would under the 1965 Contract. The only direct evidence proffered by plaintiff in support of that claimed mistake or misrepresentation is the following allegation in his own affidavit submitted in response to the defendant's motion for summary judgment:

> "I was told that the new contract was designed to produce greater income and therefore, should assist my business and so I signed the 1975 contract." (Plaintiff's Affidavit, Par. 30, R. Vol. I, at 214)

> \*     \*     \*     \*     \*     \*

> "9. When the [1975] [10] contract was put into effect, Beau Grant came out with a copy of the contract and showed me a diagram showing how much more money I would have made in the first six (6) months of 1975 had I been under the 1975 contract. James Hance also told me how much more money I would make

under the 1975 contract." (Plaintiff's Affidavit, Par. 9, R. Vol. I, at 210)

Plaintiff's claim of mistake based on the quoted language goes to the totality of expected future results from performance under the contract, not to any specific ambiguity or error on the face of the contract itself, such as a mistake in percentages in a particular commission schedule. The results of future performance, in turn, depended upon many variables impossible to quantify at the time the contract was signed, a significant number of which were largely under plaintiff's control, including: volume of sales; types of insurance products sold; number of agents recruited, trained and selling through plaintiff's agency; persistency of policies in force, i.e., amount of vestings (which includes a new set of variables, from quality of the customers who had purchased insurance to the state of the economy); variations in premium charges over the years; competition in the marketplace; and all the variables related to levels and types of agency expenses.[11]

■■■■■ Thus, at the time the parties entered into the 1975 Contract, the results of plaintiff's future performance under that contract could only have been mere conjecture, not an existing fact.[12] No claim of mutual mistake can be stated on such a basis. The Restatement (2d) of Contracts § 151(a) provides:

> "The word 'mistake' is not used here, as it is sometimes used in common speech, to refer to an improvident act, including the making of a contract, that is the result of such an erroneous belief. This usage is avoided here for the sake of clarity and consistency. Furthermore,

**10.** Plaintiff's affidavit referred to the year 1965, but plaintiff corrected that date in his brief to the year 1975.

**11.** In his brief plaintiff argues net, not gross, income figures.

**12.** If future compensation under the contract could have been determined at the time of signing simply by a mathematical exercise, plaintiff would be charged with knowledge of the result and assent to the contract terms. In Kansas,

The law presumes that the parties understood their contract and they had the intention which its terms import. It is not the function of courts to make contracts but to enforce them as made [cites omitted], nor is it within the province of the court to reform the instrument by rejecting words of clear and definite meaning and substituting others therefor. *Schnug v. Schnug,* 203 Kan. 380, 454 P.2d 474, 477–78 (1969).

the erroneous belief must relate to the facts as they exist at the time of making the contract. *A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here."* (Emphasis added.)

"A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time." *United States v. Garland,* 122 F.2d 118, 122 (4th Cir.), *cert. denied,* 314 U.S. 685, 62 S.Ct. 189, 86 L.Ed.2d 548 (1941). Neither disappointed expectations as to future events nor mistakes of judgment or belief in that regard state any claim for relief based upon mutual mistake. *See Shear v. National Rifle Assoc.,* 606 F.2d 1251 (D.C. Cir.1979); *Haas v. Pittsburgh National Bank,* 495 F.Supp. 815, 817 (W.D.Pa.1980); *John J. Duane Realty Corp. v. Great Atlantic & Pacific Tea Co.,* 8 Mass.App. 899, 394 N.E.2d 964 (1979). Moreover, the uncertainties just outlined, together with the generality of the alleged communications, would have made a common understanding as to the particulars of the supposed mistake impossible. Thus, the mutuality required under Kansas law could not have been present. *See Sidwell Oil & Gas Co., Inc. v. Loyd,* 230 Kan. 77, 630 P.2d 1107, 1110 (1981); *Schnug v. Schnug,* 203 Kan. 380, 454 P.2d 474, 478 (1969); *Palmer v. Land and Power Co.,* 180 Kan. 492, 306 P.2d 152, 157–58 (1957).

Plaintiff's claim is defective on other grounds as well. First, his income in fact increased under the 1975 Contract, notwithstanding his attempts to explain away that circumstance.[13] And, second, his claim for rescission is not timely, coming for the first time almost eight years after the contract was effective, more than three years after his alleged date of discovery,[14] and twenty-six months after this lawsuit was commenced. After his termination, he accepted more than $365,000 in contract benefits. In order to accomplish a rescission "there must be within reasonable time after knowledge of the existence of the cause ... an election to rescind," with notice to the other party, and the electing party must cease accepting benefits under the contract. 12 *S. Williston, Williston on Contracts* § 1460, at 115–119 (3d ed. 1970). The applicable rule of law in Kansas is expressed in *Cleaves v. Thompson,* 122 Kan. 43, 46, 251 P. 429, 430 (1926), where the court stated:

"Rescission is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud, or duress. Ordinarily, the nature of relief asked in such cases must be such as to place the parties in their original situation. Where one with knowledge of [the] facts entitling him to a rescission of the contract afterwards without duress ratifies it, he is not entitled to have it cancelled. Ordinarily an express ratification is not necessary in order to defeat the remedy of rescission. *Acts or conduct, inconsistent with an intention to avoid it, or in recognition of the contract, have the effect of an election to affirm it."*

*See also Nordstrom v. Miller,* 227 Kan. 59, 605 P.2d 545, 554 (1980); *Security Under-*

---

**13.** By his own figures (Plaintiff's Affidavit, Par. 13, R. Vol. I, at 211) a comparison of the years 1972, 1973 and 1974 with the years 1976, 1977 and 1978 (1975 was a partial year under the 1975 Contract, and due to his termination notice in October of that year, 1979 can only be regarded as a partial year as well), shows the following net income to plaintiff from his agency.

| 1972 | $85,699 | 1976 | $55,389 |
| 1973 | $35,704 | 1977 | $66,187 |
| 1974 | $66,557 | 1978 | $81,485 |

From those figures we learn not only that plaintiff in fact earned $15,101 more under the 1975 contract for a comparable three year period, but that his income varied widely from year to year in any event, confirming the fact that future income figures could not have been predicted with any certainty. Plaintiff essays no attempt at all to argue what he would have made if the 1965 Contract had remained in force.

**14.** In his brief, plaintiff argues he did not discover that he was allegedly making less under his 1975 Contract until sometime after his termination, presumably in 1980.

*ground Storage, Inc. v. Anderson,* 347 F.2d 964, 968 (10th Cir.1965).

The foregoing analysis also disposes of plaintiff's argument with respect to a claim of misrepresentation on the part of Penn Mutual.[15] Therefore, the district court's judgment that there exists no genuine issue of any material fact on plaintiff's claim for rescission is affirmed.

## IV

### TORTIOUS CONVERSION ISSUE

 In his twelfth cause of action, plaintiff sought an accounting with respect to amounts charged against him by Penn Mutual on his guaranty of premium finance agreements, pursuant to the provisions of the company's Premium Finance Plan. He also sought judgment for that amount (eventually determined to be $4,802.12) "due to defendant's failure to turn over the notes to the plaintiff in a timely fashion allowing the plaintiff to recover from the co-maker." Plaintiff pursued that cause of action through discovery, and before the district court, in his response to Penn Mutual's motion for summary judgment, on the theory of breach of contract. On appeal, plaintiff for the first time has raised the issue and proceeded on the theory of tortious conversion of negotiable instruments. As this court has previously stated: "We are disinclined to consider those matters which were not presented to the trial court for its consideration and are raised for the first time either after trial or on appeal to this court." *International Union of Operating Engineers, Local 953 v. Central National Life Insurance Co.,* 501 F.2d 902, 907 (10th Cir.1974), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 397 (1975).

Apart from the tortious conversion theory, plaintiff cites no authority and pursues no argument showing error in the district court's ruling on this cause of action. That ruling is, therefore, affirmed.

## V

### CONCLUSION

For the reasons expressed in the foregoing opinion, we find no error in the district court's judgment in favor of Penn Mutual, and that judgment is hereby in all respects affirmed.

---

**15.** *See Timi v. Prescott State Bank,* 220 Kan. 377, 389, 553 P.2d 315, 328 (1976). *See generally* J. Ahrens, *Some Observations on the Law of Mis-* *representations in Kansas,* 9 Washburn L.J. 315 (1970).