Sharon Faye FENDER, Plaintiff,

v.

State of KANSAS SOCIAL AND REHA-
BILITATION SERVICES; and Fran
Seymour–Hunter, in her individual ca-
pacity, Defendants.

No. 97–4035–SAC.

United States District Court,
D. Kansas.

Feb. 2, 2001.

Pantaleon Florez, Jr., Florez & Frost,
P.A., Topeka, KS, for Plaintiff.

Bruce A. Roby, Waggener, Arterburn & Standiferd, Jane Kelly Coates, Office of the General Counsel, Deborah Purce–Jones, Topeka, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on the motion of defendant, State of Kansas Social and Rehabilitation Services ("SRS"), for summary judgment, and on the separate motion of defendant Fran Seymour–Hunter for summary judgment. Plaintiff has brought claims against SRS under Title VII, 42 U.S.C § 2000e *et seq.*, alleging a religiously hostile work environment, and against individual defendant Fran Seymour–Hunter under 42 U.S.C. § 1983, alleging a First Amendment violation arising out of her enforcement of the employer's dress code. SRS's motion for summary judgment alleges that plaintiff's Title VII action is, among other matters, contractually barred, while Seymour–Hunter alleges entitlement to qualified immunity. Accordingly, neither motion addresses the merits, or lack thereof, of plaintiff's Title VII case.

## UNCONTROVERTED FACTS

The following facts are uncontroverted. Immaterial facts and factual averments not properly supported by the record are omitted.

### Facts relevant to SRS's motion

Plaintiff is a reverend and member of the Universal Life Church, and is affiliated with the WICCA religion. Plaintiff was employed as a mental health trainee at Topeka State Hospital ("TSH") from February 1995 until March 1997, when she was laid off from employment due to closure of the hospital. (Pretrial Order Stipulation, Dk. 60, p. 13). Plaintiff alleges that in mid-October of 1995, she expressed concerns about the posting of "offensive and disparaging" materials throughout the hospital, which consisted of traditional "Halloween" postings "depicting witches as ugly and worthy of fear." (Dk.60, p. 3).

Plaintiff sent a letter in mid-October to TSH Superintendent Proctor, requesting that all displays of "ugly" witches be removed because they were offensive to plaintiff's religion. Plaintiff received a response from Superintendent Proctor, stating that the postings were not in violation of the law relative to religion in the workplace, and denying plaintiff's request. Plaintiff's Kansas Human Rights Commission ("KHRC") charge alleges that plaintiff's request was denied because of her religion, but the Pretrial Order alleges that the postings created an "offensive and hostile working environment in violation of Title VII." (Dk.60, p. 4.) This event is the sole basis for plaintiff's Title VII claim against SRS.[1]

On March 21, 1996, the plaintiff was given a notice of termination from her employment with TSH.[2] By plaintiff's request, negotiations were held and a settlement agreement was entered into on April 25, 1996 by which plaintiff was "reinstated." The settlement agreement provided, among other matters, that TSH agreed to withdraw certain items from plaintiff's personnel file and nursing files, not to retaliate against plaintiff for any reports she made, and to "pay [plaintiff] wages for the period from March 21, 1996 through April

---

1. The parties have not clarified the nature of the relationship between TSH and SRS, but both act as though SRS was plaintiff's employer at all relevant times. The court presumes from the attachments to SRS's brief and from the posture of the briefs that SRS was plaintiff's "employer" for the purpose of Title VII during the time she worked at the hospital.

2. The reasons for this termination have not been disclosed to the court.

26, 1996 and that benefits for the same period shall accrue accordingly." (Dk. 51, Attachment III).

Plaintiff agreed therein, among other matters, "not to pursue any further course either in law or equity arising from her employment at TSH," and "to release and discharge TSH from any and all claims which she may have arising out of incidents relating to her employment at TSH up to the date of this agreement." (*Id.*) Both parties agreed that "in the event of a breach of this agreement [plaintiff] shall have the right to pursue all claims extinguished by this release to the full interest allowed by law and equity." (*Id.*)

Plaintiff was paid wages, pursuant to the terms of the settlement agreement, in an amount $50 less than she believes she would have earned had she worked from March 21, 1996 through April 26, 1996 and earned a shift differential. Plaintiff claims this wage deficiency constitutes a breach of contract, permitting her to pursue her otherwise barred Title VII claims against SRS.

### Facts Relevant to Fran Seymour–Hunter's Motion

Defendant Seymour–Hunter worked at TSH for almost twelve years, and at all times relevant hereto was a program nurse in the building in which plaintiff worked. As such, Seymour–Hunter not only served as overall nursing supervisor for the nursing functions, but also had supervisory responsibility over the plaintiff.

At all relevant times, TSH had a dress code applicable to all of its departments, which applied to plaintiff. The stated purpose and policy of the dress code was:

to provide standards for appropriate dress and grooming which project a pos-

itive and professional image of the hospital, address safety issues and provide role models for consumers. The policy emphasizes the importance of the appearance of staff in the overall reputation and impression of the hospital and reflects on the fine work done by the employees.

(Dk.45, Exh. A, p. 1.) Seymour–Hunter was not involved in the promulgation or development of this dress code policy, but was responsible for enforcing it as to those employees she supervised.

One of the specific standards included in the policy is that "T-shirts must be in good condition and free from graphics or slogans which are obscene and/or demeaning or offensive to others." (*Id.*) Plaintiff heard of the dress code policy during new employee orientation, and received and read the dress code policy prior to November 18, 1996.

On November 18, 1996, the director of nursing informed Seymour–Hunter that plaintiff had objected to a shirt worn by Mr. Sanders which had Christian symbols or slogans on it, and that Mr. Sanders had complained about a shirt plaintiff had been wearing.[3] The director of nursing directed Seymour–Hunter to meet with plaintiff and Mr. Sanders to remind them of the dress code policy.

Seymour–Hunter met with plaintiff and Mr. Sanders that same day regarding the issue of shirts displaying religious symbols or sayings. (Dk. 48, Exh. 1, Proctor Depo. Exh. 2). During the meeting, Seymour–Hunter reminded plaintiff and Mr. Sanders of the dress code policy regarding objectionable or offensive clothing, and told both employees that they should refrain from wearing items of clothing that others

---

**3.** Plaintiff's shirt that Mr. Sanders objected to bore the slogan: "Born Again Pagan. And Again, and again, and again," although Seymour–Hunter was not aware of this particular slogan at the time of the meeting on November 18, 1996. The record does not specify what statements and/or symbols were on the shirt worn by Mr. Sanders.

had found or might find objectionable or offensive, including those with a religious message. (*Id;* See Dk. 48, Seymour–Hunter Depo., p. 36).

Seymour–Hunter did not tell plaintiff or Mr. Sanders during the meeting of the right to appeal, but plaintiff admits she had previously read the policy, which states:

> An employee ... desiring an ongoing waiver of any standard in this policy may do so by making a written request to the Superintendent, through the Personnel Director. This request should state what standard they would like waived and a justification.

(Dk. 45, Exh. A., p. 3). Plaintiff saw no need to request a waiver because she did not consider the shirt she had worn to be offensive or obscene. (Dk. 45, Exh. D., Plaintiff's depo. p. 362–364). Plaintiff's religious beliefs do not require her to dress in a certain manner except during certain rituals and ceremonies which do not take place at work.

## SUMMARY JUDGMENT STANDARD

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indust.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

## ANALYSIS

### I. SRS's Motion for Summary Judgment

The sole claim against SRS is plaintiff's claim under Title VII that she was discriminated against or subjected to a hostile work environment based upon her religion. SRS first contends that this court lacks subject matter jurisdiction over this claim because the Title VII claim was settled, and the issue whether the settlement agreement was breached, and plaintiff's Title VII claim resultingly revived, is one of state law. Plaintiff admits that her ability to invoke the jurisdiction of this court based upon her Title VII claim against SRS "rests upon her ability to state a breach of contract under state law." (Dk.57, p. 7.) In other words, plaintiff cannot pursue her claims under Title VII, because they were encompassed within and are barred by the settlement agreement, unless the defendant breached the settlement agreement, thus reviving plaintiff's right to pursue her otherwise extinguished claims.

### A. Subject Matter Jurisdiction

SRS alleges that this court lacks subject matter jurisdiction to decide the breach of contract issue. SRS relies upon *Morris v. City of Hobart*, 39 F.3d 1105, 1112 (10th Cir.1994), to support its assertion that "a claim for breach of contract arising out of the private settlement of a Title VII claim does not arise under federal law." In *Morris*, the plaintiff filed a

discrimination case under Title VII. The parties thereafter settled the case, and the judge dismissed it with prejudice. Plaintiff then filed a second action "to enforce the settlement agreement," "claiming that defendant breached the settlement agreement." 39 F.3d at 1108. In response the defendant alleged lack of subject matter jurisdiction.

The Tenth Circuit held that the court had effectively dismissed the Title VII case pursuant to Rule 41(a)(2), and that it lacked ancillary jurisdiction to enforce the settlement agreement because the order of dismissal neither showed an intent to retain jurisdiction nor incorporated the settlement agreement as required by *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Further, no independent basis for federal question jurisdiction existed. 39 F.3d at 1110–1111. Significantly, the plaintiff did "not claim that his cause of action is created by federal law." *Id.*, at 1111. Rather, the case was simply a claim for breach of contract, part of the consideration for which was dismissal of an earlier federal suit.

By contrast, here the plaintiff has filed a claim for SRS's alleged violation of Title VII, clearly invoking the federal question jurisdiction of this court. Plaintiff's cause of action is unquestionably one created by federal law. It is only by way of defense to that federal claim that SRS alleges that plaintiff is barred by virtue of the settlement agreement. Accordingly, the court rejects SRS's claim that the court lacks subject matter jurisdiction over plaintiff's claim.

### B. Federal Common Law v. State Law

SRS next alleges that federal common law, and not the law of the State of Kansas, governs the issue regarding the alleged breach of contract. SRS alleges

that federal common law requires notice to the opposing party before rescission of a contract, *see Woods v. Denver Dept. of Revenue*, 45 F.3d 377, 379 (10th Cir. 1995)("a party entitled to avoid a transaction does so by giving notice to the other party of his decision to do so."); *Baker v. Penn. Mut. Life Ins. Co.*, 788 F.2d 650, 662 (10th Cir.1986) (holding that rescinding party must give notice to the other party), and that no such notice was given.

The Tenth Circuit has recently addressed whether the interpretation of settlement agreements in Title VII cases is governed by federal common law or by state law, in stating:

> We have held that the enforcement and interpretation of settlement agreements in Title VII cases are governed by federal common law because such settlements are "inextricably linked" to the underlying law of Title VII. *Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir.1991) ("Federal common law governs the enforcement and interpretation of such agreements because 'the right of the litigants and the operative legal policies derive from a federal source.' *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981)"). Our later opinion in *Morris v. City of Hobart*, 39 F.3d 1105, 1112 (10th Cir.1994), addressed the issue whether federal or state law governs the interpretation of such settlement agreements in the context of subject matter jurisdiction and said that the "cause of action [for breach of contract arising out of private settlement of a Title VII claim] is a subject traditionally relegated to state law."

*Heuser v. Kephart*, 215 F.3d 1186, 1190 (10th Cir.2000). *Heuser* applied state law in construing a settlement agreement because the trial court had done so, the parties agreed that state law applied, and

the applicable state law was not significantly different from federal common law.

This was a private settlement agreement, not involving the KHRC or E.E.O.C. In light of the recent Tenth Circuit rulings on this issue, the court will apply state law principles in determining whether SRS's defense of the settlement agreement is valid.

## C. Breach of Contract

Plaintiff claims that the settlement agreement was breached by SRS's failure to pay her $50 in wages that she would have earned as shift differential if she had actually worked the days in question. SRS counters that there was no promise in the settlement agreement to pay plaintiff for any shift differential or to pay her shift differential for a shift which she did not actually work, and that Kansas Administrative Regulations ("KARs") preclude SRS from so doing.

The sole agreement SRS made in the settlement agreement regarding wages was to "pay [plaintiff] wages for the period from March 21, 1996 through April 26, 1996 and that benefits for the same period shall accrue accordingly." (Dk. 51, Attachment III). Although the parties have not informed the court of what plaintiff's employment status was during those dates, both parties agree that plaintiff did not actually work those dates. Plaintiff alleges that the parties intended for plaintiff to receive all the wages she would have received had she continued working her regularly established shift on those dates. But no such language is included in the contract, and its plain language, quoted above, cannot reasonably be construed to support plaintiff's construction. Instead, that language regarding payment of wages does not mean anything other than what it says. Plaintiff was paid wages for the period from March 21, 1996 through April

26, 1996 and benefits for the same period, in fulfillment of the settlement agreement.

Further, K.A.R. 1–5–28(b) provides, with certain exceptions not relevant hereto:

a shift differential shall be paid to classified employees in positions eligible to receive overtime pursuant to K.A.R. 1–5–24 **for hours worked** on regularly established shifts other than the normal day shift or shifts. The shift differential shall not be paid to an employee for any time the employee is on any type of leave or holiday or when the employee works unscheduled hours before or after a normal day shift. (emphasis added.)

It is well established that a "regulation promulgated by an administrative agency charged with the administration of an Act has the force and effect of law if it is reasonably related to administrative enforcement and does not contravene statutory provisions." *Joudeh v. United States,* 783 F.2d 176, 180 (10th Cir.1986) (citations omitted). Furthermore, "[d]eference is accorded administrative regulations." *Wyoming Hosp. Ass'n. v. Harris,* 727 F.2d 936, 939 (10th Cir.1984) (citation omitted).

It is uncontested that plaintiff did not work any hours on a regular shift for the time she seeks shift differential compensation. The applicable regulation is unambiguous and clear in stating that a shift differential shall be paid to classified employees *for hours worked* on regularly established shifts other than the normal day shift or shifts. By law, plaintiff is not entitled to shift differential payment. Instead, the regulation specifically bars payment of such shift differential to those employees on "any type of leave or holiday," evidencing the intent of the drafters that only those who actually work shifts other than the normal day shift are entitled to be paid shift differential. Because plaintiff did not actually work during the time for which she seeks payment for shift differential,

plaintiff is not entitled to receive such payment, pursuant to this regulation.

Additionally, Kansas has long recognized and applied the rule of 'substantial performance' in the field of contract law. *Matter of Adoption of Trent,* 229 Kan. 224, 233, 624 P.2d 433 (1981). In *Cookson v. Western Oil Fields, Inc.,* 465 F.2d 460, 462 (10th Cir.1972), the court held:

The doctrine of substantial performance ... operates to bar recovery for insubstantial or formal breaches arising from the wording of a contract; ...

'When all of the grievances are considered, separately and together, they present no more than technical variances from the letter of the contract, and courts will not deny enforcement in the face of a showing of substantial performance and in the absence of a detriment. [Citation omitted.]'

"Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused ... because the actual performance is so similar to the required performance that 'any breach that may have been committed is immaterial.'" [Citation omitted.] *Almena State Bank v. Enfield,* 24 Kan. App.2d 834, 839, 954 P.2d 724 (1998), *quoting Phoenix Mut. Life Ins. Co. v. Adams,* 828 F.Supp. 379 (D.S.C.1993). Thus performance in exact correspondence with the terms of the contract is not required under Kansas law. *Id.,* at 839. A breach is material if the promisee receives something substantially less or different than he bargained for. *Id.,* at 839.

Here, despite the alleged $50 deviation or omission, SRS has performed the important and essential benefits of the contract. It reinstated plaintiff at the agreed upon time to the agreed upon shift, paid plaintiff all of the back wages and benefits to which she was legally entitled, removed various

items from her personnel and other files, and performed every other act promised in the settlement agreement. SRS has thus 'substantially performed' its promises made in the settlement agreement, and the alleged $50 shortfall in wages neither touches upon the fundamental purpose of the contract nor defeats the object of the parties entering into it. SRS's failure to pay plaintiff the $50 in question falls far short of constituting a material breach of the settlement agreement. The parties are thus bound by the terms of their contractual agreement, and plaintiff's Title VII action against SRS is accordingly barred.

**Motion by Seymour–Hunter**

■ Defendant Seymour–Hunter seeks a ruling that she is entitled to qualified immunity from plaintiff's § 1983 suit against her, which alleges a violation of plaintiff's First Amendment right of "religious freedoms." [4]

"Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tonkovich v. Kansas Board of Regents,* 159 F.3d 504, 515 (10th Cir.1998) (internal quotations and citations omitted). The key to this inquiry is the "objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." *Melton v. City of Oklahoma City,* 879 F.2d 706, 727 (10th Cir.1989)(quotations omitted), *modified on other grounds,* 928 F.2d 920 (10th Cir.1991). The issue of qualified immunity is most often determined based on the face of the complaint. *See, e.g. Tonkovich,* 159 F.3d at 515.

The initial question in the qualified immunity inquiry should be whether the complaint sufficiently alleges the violation of a federal right. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The issue of "whether the plaintiff has asserted a violation of a constitutional right at all" is a "purely legal question." *Id.*

If the complaint states a cognizable federal claim, the court should proceed to examine whether the right was clearly established at the time of the challenged conduct. That too is a question of law. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (district court may appropriately determine on summary judgment "not only the currently applicable law, but whether that law was clearly established at the time an action occurred"). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992).

This case does not involve a constitutional challenge to the dress code itself, or to any standard for evaluating religion-based requests for exceptions to the dress code. Instead, plaintiff merely alleges that Seymour–Hunter's application of the dress code to her prevented her from wearing clothing with religious slogans at work. Plaintiff contends that this act was unconstitutional because such acts were not done in furtherance of a compelling governmental interest and were not the least restrictive means of furthering that compelling governmental interest. Plaintiff rests her

---

4. Although the nature of plaintiff's claim against this defendant is nowhere specified, the court presumes that plaintiff is attempting to allege a violation of the free exercise clause.

§ 1983 claim on an alleged violation of her First Amendment right to free exercise as codified in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*

The RFRA prohibited governments, including States, from " 'substantially burden[ing]' a person's exercise of religion unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' " *City of Boerne v. Flores,* 521 U.S. 507, 515–16, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (citations omitted). RFRA was Congress' response to the decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which supplanted the compelling interest test in Free Exercise Clause jurisprudence with the inquiry into whether a governmental burden on religiously motivated action is both "neutral" and "generally applicable." As a substitute for constitutional protection, RFRA granted a statutory "claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(2) (1988 ed., Supp. V).

In June of 1997, approximately a year before plaintiff filed her brief relying on RFRA in response to Seymour–Hunter's motion, the United States Supreme Court held that RFRA exceeded Congress' authority under § 5 of the Fourteenth Amendment, insofar as it was made applicable to the States. *City of Boerne,* 521 U.S. at 515–16, 117 S.Ct. 2157. Accordingly, RFRA can provide no support for plaintiff's claims now. On November 18, 1996, however, when defendant Seymour–Hunter allegedly violated plaintiff's religious rights, RFRA was still valid law. The court will thus analyze whether the plaintiff has asserted a violation of her constitu-

tional right in light of the law at the time, and if so, whether a reasonable person in defendant Seymour–Hunter's position would have known that her conduct violated plaintiff's clearly established statutory or constitutional rights.

The burden of proving the existence of a substantial interference with the right of free exercise rests upon the religious adherent. *Werner v. McCotter,* 49 F.3d 1476, 1480 n. 2 (10th Cir.1995)(examining RFRA claim). After this threshold showing has been made, the burden then shifts to the government to demonstrate that the challenged regulation furthers a compelling state interest in the least restrictive manner. 42 U.S.C. § 2000bb–1(b). To determine whether or not the law at issue substantially burdens a plaintiff's freedom of religion, the court looks "to the degree that the government's requirement will, directly or indirectly, make the believer's religious duties more difficult or more costly." Laurence H. Tribe, American Constitutional Law § 14–12, at 1247 (2d ed.1988). At a minimum, the interference with religious beliefs "must be more than an inconvenience." *Graham v. Commissioner,* 822 F.2d 844, 851 (9th Cir.1987), *aff'd sub nom., Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

Constraints upon religious conduct will not fall within the ambit of RFRA unless a "substantial burden" is placed upon a plaintiff's ability to exercise or express his or her sincerely held beliefs or faith. *Werner,* 49 F.3d at 1480.

To exceed the "substantial burden" threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [plaintiff's] individual beliefs, *see Bryant,* 46 F.3d at 948; must meaningfully curtail a [plaintiff's] ability to express adherence to his or her faith;

or must deny a [plaintiff] reasonable opportunities to engage in those activities that are fundamental to [his] religion, *see Cruz v. Beto,* 405 U.S. 319, 322 & n. 2, 92 S.Ct. 1079, 1081–82 & n. 2, 31 L.Ed.2d 263 (1972) (per curiam) (holding that a follower of a minority religion must have "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts").

*Id.*

Here, plaintiff has not alleged that her wearing of the objectionable clothing was either required by or in adherence to any tenet of her sincerely held religious beliefs. Plaintiff has not alleged that defendant's application of its dress code policy to her made her religious duties any more difficult or more costly. The application of the dress code policy to plaintiff is not alleged to have curtailed her ability to express adherence to her faith or to have denied her reasonable opportunities to engage in those activities that are fundamental to her religion. To find that plaintiff's inability to wear a shirt with religious slogans at work constituted a substantial burden on plaintiff's exercise of her religion would, under the circumstances presented here, defy the meaning of "substantial." The interference, if any, with plaintiff's religious beliefs was no more than an inconvenience, and was not so severe as to rise to the level of constitutionally "substantial." Plaintiff has thus failed to assert a violation of her constitutional right.

The court additionally finds that a reasonable person in defendant Seymour–Hunter's position would not have known that her conduct violated plaintiff's clearly established statutory or constitutional rights. Her acts in enforcing the dress code policy as to both the plaintiff, who was a pagan, and Mr. Sanders, who was a Christian, was objectively reasonable in light of the legal rules that were clearly established at the time the action was taken and the factual situation at hand. No more is required. Accordingly defendant Seymour–Hunter is entitled to qualified immunity.

IT IS THEREFORE ORDERED THAT defendant SRS's motion for summary judgment (Dk.50) and defendant Fran Seymour–Hunter's motion for summary judgment (Dk.45) are granted.