MANCHESTER PIPELINE CORPORA-
TION, Plaintiff/Appellee,

v.

PEOPLES NATURAL GAS COMPANY,
A DIVISION OF INTERNORTH, INC.,
Defendant/Appellant.

Nos. 86–1666, 86–2720.

United States Court of Appeals,
Tenth Circuit.

Dec. 13, 1988.

court awarded Manchester its costs and referred the question of attorney's fees to a magistrate, who, after conducting an evidentiary hearing, assessed $175,000 in attorney's fees against PNG. The district court affirmed that award. PNG's appeal from the award of attorney's fees has been consolidated with its appeal from the jury verdict and award of damages to Manchester. For the reasons set forth below, we AFFIRM the jury verdict finding that PNG breached the contract with Manchester, but REVERSE and REMAND for a recalculation of damages. Because we partially remand, we do not address at this time the propriety of the award of attorney's fees to Manchester.

## BACKGROUND

William H. Davis and others discovered and developed a natural gas reservoir known as the Manchester Field (the "Field"), located in Grant County, Oklahoma. By the end of 1983, there were four completed wells in the Field. Ultimately, eleven wells were completed in the Field. In late 1983, Davis began contacting several natural gas purchasers, including PNG, to explore possibilities for selling the gas.

Actual negotiations between Manchester and PNG commenced in November, 1983. There were several meetings between Manchester representatives and PNG representatives. PNG's representatives on several occasions provided Davis with sample gas purchase contracts for his review. In April, 1984 Davis met with Rod Donovan, PNG's gas contracts representative. Donovan testified that he often, but not always, told prospective sellers that any offer he made was subject to PNG management approval. R.Vol. II at 165. Donovan further testified that his superior, Bill Eliason, never told Donovan that any of the offers or letters he [Donovan] sent in connection with the negotiations with Manchester were "improper or inappropriate." Id. at 168; R.Vol. III at 172. Eliason testified that he approved the terms Donovan was negotiating with Manchester at each stage of those negotiations and communicated those terms to other members of

Kenneth N. McKinney (David W. Kirk with him on the briefs), McKinney, Stringer & Webster, Oklahoma City, Okl., for plaintiff/appellee.

Joseph P. Titterington (William L. Peterson with him on the briefs), Kenan & Peterson, Oklahoma City, Okl., for defendant/appellant.

Before ANDERSON, BALDOCK and EBEL, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This diversity case arises out of an alleged gas purchase contract between the seller, Manchester Pipeline Company ("Manchester"), a corporation formed to sell natural gas produced from a reservoir in Oklahoma, and the buyer, Peoples Natural Gas Company ("PNG"), a natural gas distribution company. Manchester brought suit in district court in Oklahoma, claiming that PNG had breached the gas purchase contract and seeking damages. A jury returned a verdict for Manchester and awarded Manchester damages in the amount of $1,450,000. The district court denied PNG's post-trial motions for judgment n.o.v., for a new trial and for a remittitur.

Manchester thereafter filed a motion to tax costs and attorney's fees. The district

PNG's management. Eliason's superior in PNG management, Richard Coil, testified that he was generally aware of the terms being negotiated with Manchester and that he never disapproved of any such terms. R.Vol. II at 189; R.Vol. IV at 20–21. Davis testified that Donovan told him "he did have authority to negotiate contracts. He didn't imply that he had authority to sign contracts." R.Vol. II at 48–49. Coil indicated that Donovan had no actual authority to execute documents on behalf of PNG. R.Vol. IV at 19.

Donovan sent Davis a letter dated May 14, 1984 "offering" to purchase natural gas from Manchester, at the price of $2.65 per Million British Thermal Units ("MBTUs"), for a 20 year period.

The parties continued to negotiate over the following months. On three or four occasions during those months, Donovan sent to Davis a single copy of a sample gas purchase contract. On those copies, "draft copy" was stamped in red ink. On September 12, 1984, Donovan sent to Davis three copies of a document titled "Gas Purchase Contract" (the "Document"), covering six wells in the Field. These did not have "draft copy" stamped in red on the front page. The Document provided for a term of ten years and contained detailed provisions concerning price, minimum "take" obligations, determination of reserves, and the right of PNG to reduce the price paid for gas taken in order to remain competitive in the gas market.[1] The copies were accompanied by a letter, which stated in pertinent part:

"Enclosed for your review and approval, please find three copies of our Gas Purchase Contract covering acreage referenced above.

"If you find this Contract acceptable, please fully execute all three copies, (including notary pages) and return to this office. Following [PNG's] execution, one completed Contract will be forwarded to you."

R.Vol. I at Tab I, Ex. B. Coil testified that it would not be normal PNG procedure to send out a contract for a gas producer to sign unless PNG management found the terms of the contract acceptable.

On September 18, 1984, the Vice President of Manchester, Richard Massengale, executed the three copies and returned them to Donovan. PNG never executed the copies and denies that a contract for the purchase of gas has ever been formed between the parties. PNG's explanation for its failure to sign the contract is that it lost its largest industrial gas customer and there was a general "softening" of the gas market, the combined effect of which rendered it unable to enter into a contract.[2] Coil testified that he began to be concerned about PNG's loss of market even before the Document was sent to Manchester for signature, but that he "did let them go ahead and send out the contract with the understanding that it may not get approved...." R.Vol. II at 188.

The parties presented conflicting evidence as to the custom in the oil and gas industry regarding entering into gas purchase contracts. Both Donovan and Davis testified that gas purchasers always drafted the contracts. Donovan testified that, after a gas contract representative such as himself had drafted the contract, he would forward it to the producer for execution. He testified that after the gas contract representative had received the executed copy from the producer, he would "forward it to ... management for their review and finally their execution." R.Vol. III at 148. Coil testified similarly as to the custom in the industry. He stated that "we do not feel we have a contract with the producer

---

1. This latter is the so-called "market-down" or "market-out" provision, which is frequently included in long term gas purchase contracts and which the parties argue here impacts upon any damages Manchester suffered from PNG's alleged breach of contract. See 37 *Institute on Oil and Gas Law and Taxation*, § 6.06[2] (1986).

2. PNG raises but does not stress the argument that, assuming the existence of a contract between the parties, performance could be excused under the force majeure clause of the contract on the theory that a failure of the gas market constitutes a force majeure. A recent Oklahoma case forecloses the availability of that and related arguments. See *Golsen v. ONG Western, Inc.*, 756 P.2d 1209 (Okla.1988).

until it is signed by both parties." R.Vol. IV at 16. PNG presented an expert witness who testified that this practice was followed without exception. Davis testified that, in practice, while the buyer always expected the producer to sign and execute the contract first, the buyer always returned an executed contract once the producer had executed the document. Manchester's expert, William Dutcher, testified that it was the custom in the oil and gas industry to only formally exchange executed documents after the producer and buyer had agreed, at least verbally, on all the terms. One of the other working interest owners of the producing wells in the Field, George Singer, expressed a similar opinion.

During the negotiations between PNG and Manchester, the parties had agreed that Manchester would acquire any necessary rights of way and construct a pipeline from the Field to PNG's pipeline system. This obligation was embodied in the Document. R.Vol. I at Tab 1, Ex. C. Davis testified that in July and August, he instructed Massengale, who was an engineer, to commence the engineering studies necessary for Manchester to build the pipeline. R.Vol. II at 117–18. He further testified that, at PNG's request, Manchester used larger pipe in building the pipeline (six-inch instead of four-inch) "to match up with the system they [PNG] already had in place." *Id.* at 51. Donovan testified that he had a number of conversations with Massengale concerning the pipeline, and that he told Massengale "that it would be more prudent to wait until after the contract had been approved and executed by my management before he would go ahead with [the pipeline]." R.Vol. III at 149.

After Manchester returned the executed copies of the Document, Davis met with Donovan and Eliason in September, 1984 to discuss the pipeline. There was conflicting evidence as to what happened at that meeting. Manchester presented testimony that Davis was assured that, despite PNG's failure to return the executed copy of the

Document, PNG wanted to purchase Manchester's gas but was experiencing some internal gas allocation problems, and that Davis should continue in his efforts to construct the pipeline. Donovan and Eliason testified that Eliason explained to Davis PNG's hesitancy to sign the Document, and urged Davis to discontinue construction on the pipeline until PNG's management had signed it. Eliason testified that, at that meeting, PNG was only "considering" whether to purchase Manchester's gas. Donovan further testified that Davis said he would continue with the pipeline and sell to another buyer if PNG refused to sign the Document. Donovan then acknowledged that, after Davis said he would continue the pipeline and sell to another buyer if PNG refused to sign the Document, he never again urged Davis to stop building the pipeline.[3]

Davis testified that Donovan called him in mid-October to tell Davis that PNG was losing a major customer, but that Donovan assured Davis he should continue with the pipeline. Donovan also informed Davis that PNG would probably only be able to take the minimum amount discussed. Donovan characterized this phone conversation differently. He testified that he never discussed the pipeline and that he told Davis "it was very unlikely that our management was going to agree to sign the contract." R.Vol. III at 157.

Donovan sent a letter to Davis dated October 29, 1984 in which he said there would be no binding contract until PNG's management signed and executed the Document, and advising Manchester not to proceed with installation of the pipeline until PNG's management had done so. On November 2, Davis and Singer met with Donovan and Eliason. The parties presented conflicting evidence as to what happened at this meeting. Davis and Singer both testified that Donovan and Eliason both admitted that, while they felt PNG was already bound by the contract, PNG's management would only execute the documents if Man-

---

3. Donovan testified "I had no reason to tell him to stop building that pipeline after September 28th." R.Vol. III at 198.

chester would lower the amount of gas PNG was obligated to purchase under the contract by agreeing to a lower reserve estimate figure. Donovan and Eliason both testified that the meeting primarily consisted of Singer's attempts to persuade PNG to sign the Document. After a subsequent meeting between Manchester's engineer and PNG's representatives, the parties agreed on a lower reserve figure. Correspondence from Donovan acknowledged this agreed upon reserve figure. Addendum to Brief of Appellant, Tab F. On December 27, 1984, PNG informed Manchester that it would not sign the Document.

In an effort to mitigate its damages, Manchester contracted with Scissortail Natural Gas Company and extended the pipeline to connect with this buyer's facilities. The contract with Scissortail ("Scissortail Contract"), dated December 1, 1984, was a one year "spot market" contract, with a renewal option.[4] Under that contract, Manchester sold gas from the Field at a lower price, $2.58 per MBTU, than that stipulated under the contract with PNG.

Manchester sued PNG, claiming breach of contract. PNG's response was that there was never a contract between itself and Manchester and, even if there was, it denied that Manchester suffered any damages from PNG's breach.

With regard to the existence of a contract, PNG argues that its motion for judgment n.o.v. should have been granted because there was insufficient evidence that the parties had entered into a binding contract to sell gas. It argues that the evidence produced at trial shows that "the parties intended that the reduction to writing and execution of the contract was a condition precedent to its existence." Brief of Appellant at 16. Relying on Sections 26 and 27 of the *Restatement (Second) of Contracts*, PNG argues that Manchester had "reason to know" that PNG did not intend to become bound by the agreement until it signed and executed the copies.[5]

Manchester responds that the conflicting evidence as to the custom in the oil and gas industry concerning formalization of gas purchase contracts at least created a jury question as to whether Manchester had "reason to know" that PNG did not intend to be bound until it had signed the Document, and the jury resolved that question in Manchester's favor. Manchester further argues that, under Okla.Stat. tit. 12A, § 2-206, PNG's letter was an offer "inviting acceptance in any manner and by any

---

**4.** Davis testified that a "spot market" contract is based on "month to month marketing," rather than a "long term firm agreement." R.Vol. II at 91. Manchester's expert, Dutcher, described the "spot market" as referring to "direct sales from a producer to an end user, such as a large industry or an electric utility, or a local distribution company directly, as opposed to the producers selling the gas ... to a pipeline, who would ... resell it to these end users." R.Vol. III at 47. Typically, a spot market contract has a term of from one month to one year, has no "take or pay" provision, no "minimum take" provision, and provides the producer with a lower price than it would get under a long term contract. R.Vol. II at 91–92.

**5.** Section 26 of the *Restatement* provides as follows:
 "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."
*Restatement (Second) of Contracts* § 26 (1979). Comment a to Section 26 states as follows:

" 'Reason to know' depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business."
*Id.* at § 26 comment a.
Section 27 provides as follows:
"Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations."
*Restatement (Second) of Contracts* § 27 (1979). Comment b to section 27 states as follows:
"[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract."
*Id.* at § 27 comment b.

medium reasonable in the circumstances" and that Manchester reasonably accepted by returning the executed copies to PNG.[6]

With regard to the damages awarded Manchester, PNG argues that the district court erred in instructing the jury on the method for computing Manchester's damages and on incidental damages and argues that the jury's award of damages was not supported by credible evidence.

## DISCUSSION

"In this circuit, the sufficiency of the evidence to go to the jury is a matter of federal law even in diversity cases." *Fed. Deposit Ins. Corp. v. Palermo*, 815 F.2d 1329, 1335 (10th Cir.1987); *see also Suggs v. State Farm Fire and Casualty Co.*, 833 F.2d 883, 887 n. 5 (10th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1732, 100 L.Ed.2d 196 (1988); *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 612 (10th Cir.1984). We should only grant judgment n.o.v. "when all the inferences to be drawn from the evidence are so in favor of the moving party that reasonable persons could not differ in their conclusions." *Palermo*, 815 F.2d at 1335. We "may not weigh the evidence, pass on the credibility of witnesses, or substitute [our] judgment for that of the jury." *Brown*, 736 F.2d at 613. And, while federal standards govern the sufficiency of the evidence, Oklahoma provides the substantive law applicable to the underlying causes of action. *Id.*

Similarly, the denial of a motion for a new trial in a diversity case is governed by federal law. *See Suggs*, 833 F.2d at 887 n. 5; *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1058 (10th Cir.1983). PNG argued before the district court that a new trial was required because the verdict was against the weight of the evidence.

"A motion for a new trial made on the ground that the verdict of the jury is against the weight of the evidence normally presents a question of fact and not of law and is addressed to the discretion of the trial court. On review, we will not disturb the denial of a motion for a new trial unless there is a showing of manifest abuse of discretion. The standard we use in determining this is whether the verdict is 'clearly, decidedly, or overwhelmingly' against the weight of the evidence."

*Brown*, 736 F.2d at 616–17 (citations omitted).

Here, the jury was instructed that, in order to find for Manchester, it had to find by a preponderance of the evidence that a contract existed between Manchester and PNG. Alternatively, the jury was instructed that, if it found no contract existed between Manchester and PNG, it should consider whether PNG is equitably estopped from denying that it was reasonable for Manchester to rely on PNG's promise to buy Manchester's gas.

■ As the district court instructed the jury, in order for there to be a contract between two parties, there must be a meeting of the minds on all material elements of the contract. *See Watkins v. Grady County Soil and Water Conservation District*, 438 P.2d 491, 494 (Okla.1968) ("there must be a meeting of the minds of the parties on all material parts of the agreement in order to settle a valid contract."). Furthermore, since the alleged contract related to the sale of natural gas reserves to be severed from the earth by the seller, Oklahoma's codification of the Uniform Commercial Code applies. *See Golsen v. ONG Western, Inc.*, 756 P.2d 1209, 1220 (Okla.1988) (Kauger, J., concurring); Okla.

---

**6.** Alternatively, Manchester argues that the Oklahoma Supreme Court has recognized that the doctrine of equitable estoppel can estop a party from denying the existence of an agreement. The jury was instructed on both the contract and estoppel theories. Since the jury only returned a general verdict for Manchester, we cannot tell whether the jury found that there was a contract between Manchester and PNG or

whether it found for Manchester based on an equitable estoppel theory. As we discussed more fully in the text of this opinion, there was sufficient evidence in this case from which the jury could find that a contract existed between the parties. Additionally, there was sufficient evidence to support a jury verdict for Manchester on equitable estoppel grounds.

Stat. tit. 12A, § 2–107.[7] Under Okla.Stat. tit. 12A, § 2–206:

"(1) Unless otherwise unambiguously indicated by the language or circumstances

"(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."

Manchester argues that the September 12 transmittal of the letter and three copies of the Document was an "offer" and that Manchester's prompt return of the executed copies was "acceptance in any manner and by any medium reasonable in the circumstances." PNG argues that, following the *Restatement (Second) of Contracts*, there could be no "offer" as long as Manchester had "reason to know" that PNG did not intend to become bound until PNG had itself executed the Document.

 In Oklahoma, as under the law of most states, the question of the existence of a contract is a question of fact for the jury to resolve. *See Graham v. Bishop*, 428 P.2d 223, 225 (Okla.1967); *see also I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882 (Colo.1986); *Arrowhead Construction Co. of Dodge City, Kansas, Inc. v. Essex Corp.*, 233 Kan. 241, 662 P.2d 1195, 1201 (1983); *Segura v. Molycorp, Inc.*, 97 N.M. 13, 18, 636 P.2d 284, 289 (1981); *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees*, 681 P.2d 1326, 1330 (Wyo.1984). The questions of PNG's intent not to be bound by the Document until it had executed copies of it and of whether Manchester had "reason to know" that PNG did not

intend to conclude a bargain until further indication from PNG, are factual questions. As we have indicated, comment a to section 26 of the *Restatement* explains that:

" 'Reason to know' depends not only on the words or other conduct, but also the circumstances, including previous communications of the parties and the usages of their community or line of business."

*Restatement (Second) of Contracts* § 26 comment a (1979).

The jury in this case heard conflicting testimony as to the substance of numerous conversations and communications between PNG representatives and Manchester representatives concerning PNG's purchase of Manchester's gas and concerning the Document. There was conflicting evidence as to the parties' understandings and communications concerning Manchester's obligation to build the pipeline. Additionally, the testimony conflicted as to the custom in the oil and gas industry for formalizing contracts and as to the expectations and understandings of buyer and seller at different stages in the contract formation process. After carefully reviewing the record, we conclude that there was sufficient evidence from which the jury could conclude that PNG's transmittal of the three copies of the Document, with the September 12 letter, constituted an "offer" which Manchester accepted in a reasonable manner by returning the copies, signed and executed, thereby forming a contract on the terms contained in the Document as modified, if at all, by any later mutual agreement.[8]

---

**7.** Section 2–107 provides in pertinent part:
"(1) A contract for the sale of minerals or the like, including oil and gas ... is a contract for the sale of goods within this article if they are to be severed by the seller...."
Okla.Stat. tit. 12A, § 2–107.

**8.** The parties both address the question of Donovan's authority to enter into a contract on PNG's behalf. PNG argues "Davis admitted that he was aware that ... Donovan lacked authority to enter into a contract on behalf of [PNG]." Brief of Appellant at 16. Thus, PNG suggests Donovan lacked authority to bind PNG. In the face of conflicting evidence, the question of whether Donovan was PNG's agent with respect to any contract is a question of fact. *See Agee v. Gant*, 412 P.2d 155, 160 (Okla.1966); *cf. Mitchell v.*

*Ford Motor Credit Co.*, 688 P.2d 42, 46–47 (Okla. 1984) (where facts concerning agency are undisputed and no conflicting inferences can be drawn therefrom, question of agency is one of law for court to decide). Here, there was conflicting evidence as to what representations were made to Manchester concerning Donovan's authority, and, while there was evidence that Donovan was not authorized to execute contracts binding PNG, there was evidence that all of Donovan's actions, including the transmittal of the Document with the September 12 letter, were approved by Donovan's superiors at PNG. In such a situation, we do not disturb the jury's implicit finding that Donovan was PNG's agent for the purposes of the contract between Manchester and PNG.

■ We remand, however, for a redetermination of the damages payable by PNG for breach of the contract. PNG argues that the court misinstructed the jury on the computation of damages for years two through ten of the contract. The district court's instruction was as follows:

> "In order to determine the amount of damages: (1) for the first year, you may consider the evidence presented with regard to the difference between the agreed to price, if any, for the gas and the price obtained at resale of the gas to Scissortail Natural Gas Company, but that price is not conclusive, except to the extent that it reflects a standardized market price at the time and place defendant [PNG] would have had to take the amount of gas agreed, if there was an agreement, to be taken for the first year; plus (2) for the years two through ten, you may consider the evidence presented with regard to the difference, if any, between the market price for the gas at the time and place in the future when defendant [PNG] would have had to take that portion of plaintiff's [Manchester's] reserves as agreed, if agreed, and the agreed price, if any."

Instruction No. 14, R.Vol. I at Tab 31.[9] PNG argues that this instruction conflicts with Oklahoma's statutory provisions for calculating damages for non-acceptance or repudiation of a contract. We agree.

Under Okla.Stat. tit. 12A, § 1–106, "[t]he remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...." PNG argues that Okla. Stat. tit. 12A, §§ 2–708 and 2–723 govern the measure of a seller's damages for non-acceptance or repudiation of a contract. Section 2–708 provides in pertinent part:

> "Subject to subsection (2) and to the provisions of this Article with respect to

proof of market price (Section 2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach."

Okla.Stat. tit. 12A, § 2–708(1). Section 2–723 provides in pertinent part:

> "If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price (Section 2–708 or Section 2–713) shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation."

*Id.* at § 2–723(1). Accordingly, PNG argues Manchester's damages should be determined in accordance with the price of gas "prevailing at the time when the aggrieved party learned of the repudiation."

The comment to section 2–723 of the Oklahoma Code states as follows:

> "There are no previous Oklahoma decisions. This changes the rule as previously stated in Williston on Sales, Section 587, which says that when an action for anticipatory breach comes to trial before performance date the measure of damages is the difference between the contract price and the market value at the date fixed in the contract for performance. Thus, the jury must speculate by attempting to predict what the future market value will be. The Commercial Code rule is more certain and far easier to apply."

*Id.* at § 2–723, Oklahoma Code Comment. The Uniform Commercial Code Comment to that section states in part "[t]his section is

---

**9.** PNG appears not to challenge part (1) of the instruction, concerning Manchester's damages for the first year of the contract.

not intended to exclude the use of any other reasonable method of determining market price or of measuring damages if the circumstances of the case make this necessary." *Id.* at § 2–723, Uniform Commercial Code Comment. The district court apparently relied on this latter comment in giving the challenged instruction. In its order denying PNG's motions for judgment n.o.v. or for a new trial, the court stated:

"The Court acknowledges that in most circumstances the measure of damages for repudiation is determined according to the price of the goods prevailing at the time when the aggrieved party learned of the repudiation. Okla.Stat. tit. 12A. § 2–723(a) (1981). Nevertheless, the unique circumstances of a gas purchase agreement with a take or pay obligation requires that the jury consider the extreme unpredictability of the future market. Giving the jury such discretion, provides the opportunity to find plaintiff is or is not entitled to recover damages for any alleged loss in the future. Because the nature of the gas market is uniquely nonstandard and the terms of gas purchase agreements are not easily analogized to commercial contracts in general, this Court finds the circumstances of this case, as presented at trial, fell within the scope of the commentary to Section 2–723, that states other reasonable methods of determining market price or measuring damages are not excluded from use where necessary."

R.Vol. I at Tab 43. Manchester argues that the district court's decision to depart from the literal application of section 2–723 "is in line with the modern trend of the law." Brief of Appellee at 24. Both parties concede that there are no Oklahoma cases directly on point.

In determining the proper measure of damages for breach of a long term contract such as the one between Manchester and PNG, we must bear in mind the fundamental objective of the remedies provisions of the Uniform Commercial Code—to place "the aggrieved party ... in as good a position as if the other party had fully performed." Okla.Stat. tit. 12A, § 1–106. As indicated, section 2–723 provides that, in an anticipatory repudiation action which is brought before the time for performance, damages are calculated on the basis of the market price at the time the aggrieved party learned of the repudiation. That section has, as the Oklahoma Code Comment indicates, the virtue of certainty. The jury need not "speculate by attempting to predict what the future market value will be." *Id.* at § 2–723, Oklahoma Code Comment. Because Manchester's action was brought long before the time for full performance under the ten year contract had passed, section 2–723 appears to apply. Nonetheless, we are aware of the peculiar difficulties presented by attempting, at the end of the first year of a ten year contract, to calculate damages for the entire contract period.[10] The fact that damages are difficult to ascertain does not, however, mean they are unascertainable. *See Thompson v. Kerr–McGee Refining Corp.*, 660 F.2d 1380, 1388 (10th Cir.1981) ("When the cause and existence of damages have been established with the requisite certainty, recovery will not be denied because the amount of such damage is difficult of ascertainment. A reasonable basis for computation and the best evidence available under the circumstance is sufficient."), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982). We therefore see no reason to depart from section 2–723's mandate to calculate market price at the time Manchester learned of the repudia-

---

**10.** In support of its argument that section 2–723 provides the proper measure of damages, PNG refers us to a recent Second Circuit case involving breach of a long term aluminum supply contract. *See Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902 (2d Cir.1985). The court in *Trans World Metals* applied the damages rem-

edy of section 2–708. In dicta, the court stated "[w]e would accept Southwire's argument that the date Trans World learned of the repudiation would be the correct date on which to calculate the market price had this action been tried *before* the time for full performance under the contract." *Id.* at 909 (emphasis original).

tion, and we therefore remand for a redetermination of damages. Because we believe that the focus of the parties' damages evidence was misplaced, however, we offer the following additional guidance to the trial court on retrial.

In our view, the central problem with the evidence and arguments presented regarding Manchester's damages was that they primarily focused on the difference between the long term contract price between Manchester and PNG and the spot market price under a spot market contract such as the Scissortail Contract. While Manchester's expert, Dutcher, expressed an opinion as to the average price of gas under long term contracts containing market down provisions in November, 1985, the bulk of his testimony, as well as both Manchester's and PNG's exhibits, was on the difference between the spot market price and the Manchester–PNG contract price. Insufficient evidence was presented on the average price of gas under long term contracts in November or December, 1984, the time at which Manchester learned of the repudiation. As the evidence presented clearly indicated, however, the spot market is very volatile and uncertain. That contrasts with the predictability of a long term contract with a minimum take provision and a take or pay provision.[11] Spot market contracts differ significantly from long term contracts. In our view, Manchester's damages should be calculated by reference to the difference between the Manchester–PNG contract price and the market price of gas under a similar long term contract at the time Manchester learned of PNG's repudiation.[12]

PNG also challenges the district court's jury instruction regarding incidental damages. The challenged instruction stated:

"You may also consider, in order to determine the amount of damages, incidental damage the plaintiff may have suffered. Incidental damages include any commercially reasonable charges, expenses or commissions, incurred in stopping delivery of the gas, in the transportation, care and custody of the gas after defendant failed to comply with its agreement, in connection with return or resale of the gas or otherwise resulting from defendant's failure to comply with its agreement, if any. Plaintiff claims its incidental damages include the cost of building the pipeline and then extending the pipeline. Defendant denies such costs are incidental damages and claims plaintiff would have had to incur them anyway.

"Finally, you should deduct from the amount of damages you determine, any expenses the plaintiff may have saved as a result of defendant's failure to comply with its agreement, if any.

"You are instructed that what is commercially reasonable is a question of fact to be determined by the nature of the goods, the condition of the market and any other pertinent circumstances of the case."

R.Vol. I at Tab 31.

PNG argues as follows concerning the instruction and evidence of incidental damages:

---

**11.** PNG argues strenuously that the market down provision contained in the contract with Manchester would have resulted in a decreasing price each year. Nonetheless, Manchester's expert testified that it was as reasonable to estimate that, despite the market down provision, the price would average out to $2.75 per MBTU throughout the ten year term. In any event, evidence as to the market price of gas under long term contracts containing market-down provisions will take into account the existence of such provisions and their likely effect on the price of gas.

**12.** We note that at least one commentator views section 2–723 differently. *See* Jackson, " 'Antici-

patory Repudiation' and the Temporal Element of Contract Law: An Economic Inquiry into Contract Damages in Cases of Prospective Nonperformance," 31 Stan.L.Rev. 69, 104 (1978) ("While silent on the issue, section 2–723 appears to envision 'the price of such goods prevailing at the time the aggrieved party learned of the repudiation,' the *spot* price prevailing on that date.") (emphasis original). The commentator goes on, however, to make a persuasive case that "hypothetical market-based-damages ... should ... be based on the forward market price as of the date of the repudiation." *Id.* at 72.

"Under the terms and conditions of the disputed contract, Manchester was solely responsible for the cost of constructing the pipeline to the point of delivery. Thus, even if a contract exists and [PNG is] liable to Manchester for damages, it cannot be held liable for the cost of constructing the pipeline to point of delivery specified in the contract. Only that portion of its pipeline costs which are directly attributable to [PNG's] alleged breach may be considered. However, even this portion of pipeline expense may not be laid entirely at [PNG's] feet. The cost of extending the pipeline should have been apportioned between the parties. Manchester used the pipeline to sell the gas from five wells not included in the disputed contract. It enjoyed gas sales of $5,246,621.44 during an eight month period ending September, 1985. [PNG] would have been obliged to purchase only $346,130.00 worth of gas during this period. However, Manchester did not deduct that portion of its pipeline expenses attributable to the enormous sales which it enjoyed from these five wells. The Trial Court's failure to properly instruct the jury in this regard is error."

Brief of Appellant at 20–21.

We find no error in the instruction. The instruction correctly defined "incidental damages." *See* Okla.Stat. tit. 12A, § 2–710. It then simply stated that Manchester claimed the pipeline costs as incidental damages but that PNG argued that they were not incidental damages and that Manchester would have incurred them anyway. It further cautioned the jury to deduct any amounts Manchester saved from PNG's repudiation. That instruction is correct.

Finally, PNG argues that, even assuming the correctness of the jury instructions on damages, the award of $1,450,000 was clearly erroneous and not supported by credible evidence. Because we remand for a redetermination of damages, we do not address this issue. Furthermore, because we partially remand for further proceedings, we do not address PNG's challenge to the award of attorneys' fees in this case. Presumably, the challenges made on appeal to that award will be presented to the district court when a new application for attorneys' fees is made after damages are determined on remand.

We have considered all of PNG's arguments on appeal, and for the foregoing reasons the district court opinion is AFFIRMED in part, REVERSED and REMANDED in part.