**DEEPWATER INVESTMENTS, LIMITED, Plaintiff–Appellee,**

v.

**JACKSON HOLE SKI CORPORATION and Paul M. McCollister, Defendants–Appellants.**

No. 90–8051.

United States Court of Appeals, Tenth Circuit.

July 10, 1991.

Fredrick E. Sherman (Christopher P. Hall and Jonathan D. Schwartz of Jones, Day, Reavis & Pogue, New York City, Blair J. Trautwein and Michael Rosenthal of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., with him on the brief), for plaintiff-appellee.

Peter W. Sipkins (James R. Kahn and Carol A. Peterson of Dorsey & Whitney, Minneapolis, Minn., W. Perry Dray and Gregory C. Dyekman of Dray, Madison & Thompson, Cheyenne, Wyo., with him on the brief), for defendants-appellants.

Before McKAY, ALDISERT * and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a breach of contract action wherein, on motion for summary judgment, the district court held that there was an enforceable written contract between the parties and ordered specific performance. The principal question is whether there is a genuine issue of material fact as to the existence of an enforceable written contract between the parties. The jurisdiction of the district court was based on diversity of citizenship. 28 U.S.C. § 1332. Our jurisdiction is based on 28 U.S.C. § 1291.

■ Fed.R.Civ.P. 56 governs summary judgment proceedings in a federal court. Wyoming law, however, governs the contract issues presented. Accordingly, the question is whether the federal district judge sitting in the United States District Court in the District of Wyoming correctly read Wyoming contract law and then correctly applied it to the facts at hand. In our review, we are of course not bound by the district court's understanding of Wyoming law. Our review is *de novo*, and no deference should be given the district court's understanding of Wyoming state law. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

As indicated, this litigation was resolved on a motion for summary judgment, the district court having before it the pleadings, numerous depositions and affidavits, the oral argument of opposing counsel, as well as a transcript of the testimony given at a hearing held on a motion for preliminary injunction. The chronology of the events out of which the present litigation arose must be rather fully developed if the issues are to have meaning.

Jackson Hole Ski Corporation (JHSC) is a Wyoming corporation with its principal place of business in Teton Village, Wyoming, where it operates a well-known ski resort. It also has considerable assets related to the development and sale of real estate in the vicinity of the ski resort. Paul McCollister is the principal shareholder in JHSC, its chief executive officer, and president of the corporation.

Deepwater Investments, Limited (Deepwater) is a corporation organized under the laws of the Island of Bermuda with its principal place of business in Hamilton,

* Honorable Ruggero J. Aldisert, United States Senior Circuit Judge for the Third Circuit Court of Appeals, sitting by designation.

Bermuda. Johannes Christiaan Martinus Augustinus Maria Deuss, a Dutch oil trader who resides in Bermuda, owns and controls Deepwater. He also owns a vacation home near JHSC's ski properties and is himself a skier.

Deuss and McCollister had a personal acquaintance of some duration, and in December, 1986, discussion occurred concerning Deuss buying into JHSC. This discussion was initiated by McCollister who was interested in obtaining working capital for JHSC. McCollister first proposed that Deuss (Deepwater) pay McCollister (JHSC) the sum of $11,000,000 for approximately 35% of the outstanding shares of JHSC. Deuss was not interested in this proposal. He was interested only in buying into JHSC's ski operations and was not interested in JHSC's other real estate operations.[1]

Deuss was definitely interested, however, in buying into JHSC's ski operations. In this connection, it was agreed by both Deuss and McCollister that if Deepwater were to purchase an interest in JHSC's ski operations, it should be based on an independent appraisal. At the suggestion of McCollister, Deuss retained Sno–Engineering, Inc., a New Hampshire company, to make an appraisal of JHSC's ski operations. An appraisal was later made by Sno–Engineering which set the value of JHSC's ski operations at $11,329,000, arriving at that figure by discounting to present value the projected future earnings of the mountain ski operation.

On April 23, 1987, Deuss and McCollister met in New York City and on the following day, April 24, 1987, in Philadelphia where there were further discussions regarding the proposed investment by Deuss in JHSC. Out of these two meetings, Deuss and McCollister agreed to the following: (1) the Sno–Engineering report would form the basis for Deuss's investment in JHSC; (2) Deuss would pay $3,600,000 for approximately 24% of the outstanding shares of stock in JHSC, once the real estate assets had been separated out; (3) Deuss's per-

centage of equity in JHSC would be adjusted at the end of five fiscal years to reflect the actual performance of JHSC during that five-year period, and after such adjustment Deuss would own no less than 20% and no more than 49% of the outstanding shares in JHSC; (4) Deuss would have one seat on the board of directors; (5) Deuss would have a right of first refusal of McCollister's interest in JHSC should McCollister die; (6) Deuss would have the option to invest another $2,000,000 in JHSC within two years in exchange for 33% ownership interest subject to the readjustment five years from the initial investment; (7) JHSC would be subject to certain restrictions concerning incurring debt and issuing stock; and (8) if Deuss was to advance money before the issuance of any stock he wanted a written agreement. At these two meetings there was, apparently, no discussion of just how this transaction would be structured, although restructuring of some sort was necessary since JHSC owned both ski properties and non-ski properties, and Deuss desired to invest in the former only.

On May 1, 1987, Deuss faxed a letter to McCollister to confirm the terms and conditions which he understood they had agreed to at their meetings in New York and Philadelphia. On that same date Deuss wired $608,053 to JHSC.

When McCollister received Deuss's May 1 letter, he reviewed it with his attorney and made certain revisions to reflect his understanding of the agreement reached in New York and Philadelphia. McCollister and his attorney spoke with Deuss by telephone on May 4, 1987. Deuss agreed that many additional documents needed to be negotiated and executed. And then on May 5, 1987, McCollister faxed a document which he labeled "RE: Interim Agreement" to Deuss. McCollister believed that this document reflected the terms and conditions agreed to by Deuss and himself in their meetings on April 23 and 24. It incorporated much of the letter which Deuss had faxed him on May 1, 1987, plus McCol-

---

1. Deuss was not interested in loaning money to JHSC and was only interested in buying an equity interest in JHSC. McCollister was in need of working capital, but, at the same time, he did not want to lose control of the company which he had run for some thirty-five years.

lister's revisions. It also used the phrase "our interim Agreement pending final closing of this transaction." McCollister prepared the May 5th letter with the expectation and intent that additional documents were required to finalize the agreement.

On May 6, 1987, Deuss wrote McCollister as follows:

> I refer to your letter of May 5, 1987 which summarizes our interim agreement and I would like to confirm that I am in complete agreement with the contents of your letter....[2]

As indicated, Deuss made an initial payment to McCollister in the amount of $608,-053 on May 1, 1987, the date when Deuss faxed to McCollister his understanding of their verbal agreement. A second payment in the sum of $627,304 was made on May 15, 1987.

Shortly thereafter, problems began to arise. Under paragraph 4 of the interim agreement, JHSC agreed that before issuing stock in JHSC to Deuss it would "sell, or otherwise transfer, to another corporation" JHSC's non-ski properties. In this connection, McCollister, and his attorney, had apparently become aware that an outright sale or transfer of JHSC's non-ski properties to an unrelated corporation could produce unfavorable tax consequences. Accordingly, on July 2, 1987, McCollister's attorney sent a letter to Deuss proposing that Deepwater's investment would be structured as an equity interest in a subsidiary of JHSC into which JHSC's ski operations would be transferred. On July 7, 1987, Deuss wrote back to McCollister and stated that such was not in accord with their agreement and that he objected to any such arrangement. Deuss was apparently concerned that a subsidiary company might be liable for the debts of its

parent corporation.[3] In the July 7 letter, Deuss also stated that if McCollister did not want to go through with the deal, he could return the monies previously advanced and call the entire deal off. McCollister did not call the deal off and received eight more payments to the end that by November 25, 1987, Deuss had paid McCollister the entire $3,600,000 called for by the interim agreement.[4]

Other differences also arose between McCollister and Deuss regarding contract terms. At this point, it is sufficient to note that there were further proposals that McCollister return to Deuss the $3,600,000 plus interest, and the deal would be called off. In this connection, on February 5, 1988, Deuss wrote McCollister informing him that if he returned the $3,600,000 plus interest by February 15, 1988, their deal would be called off, but that if there were no such repayment by that date, he would take all necessary steps to enforce their agreement. On February 8, 1988, McCollister wrote Deuss informing the latter that his February 15 deadline was unreasonable and that complete repayment by that date could not be made. Repayment was not made and this litigation ensued.

On February 16, 1988, Deepwater filed the present action in the United States District Court for the District of Wyoming, naming JHSC as the only defendant. Under the heading "Facts Underlying All Claims," counsel set forth in detail the background facts out of which the controversy arose and then asserted six claims for relief. In Count One, Deepwater alleged a breach of written contract, in Count Two a breach of oral contract, and in Count Three promissory estoppel. As to each of these three claims, Deepwater asked for specific performance. In Counts Four, Five and Six, Deepwater alleged a breach

---

**2.** In his May 6 letter, Deuss did object to language related to the exercise of his right of first refusal to purchase McCollister's interest in JHSC in the event of McCollister's death, an event which, of course, has not occurred.

**3.** McCollister, in his testimony at the hearing on Deepwater's request for a preliminary injunction and again in an affidavit filed in opposition to Deepwater's motion for summary judgment, stated that although Deuss initially objected to

receiving an equity interest in a subsidiary corporation to which JHSC would transfer its ski properties, he later verbally agreed to such.

**4.** Monies given JHSC (McCollister) by Deepwater (Deuss) were used to finance lift construction and mountain "grooming" operations which had to be completed during the summer months.

of contract, unjust enrichment, and for money had and received. As to those counts, Deepwater asked for money damages.

At the same time the complaint was filed, Deepwater also filed a motion for a temporary restraining order and a preliminary injunction. The thrust of this motion was to obtain an order that would maintain the status quo and prevent JHSC from issuing more stock, merging or consolidating with any other corporation, or incurring indebtedness greater than $100,000 pending the outcome of the litigation.

A hearing was held on Deepwater's motion for a preliminary injunction on March 1 and 2, 1988, at which time opposing counsel were present. On April 1, 1988, the district court, after reviewing the pleadings and the testimony of the various witnesses, as well as the oral and written argument of opposing counsel, granted Deepwater a preliminary injunction along the lines indicated above.

Although we do not find JHSC's answer in the record before us, presumably it denied liability. . After considerable discovery, Deepwater filed a motion for summary judgment. Again, we do not find Deepwater's motion for summary judgment in the record before us. However, a memorandum in support of summary judgment, and a memorandum in opposition to summary judgment, are in the present record.

Prior to the hearing on the motion for summary judgment, JHSC filed a motion to amend its answer by adding an additional affirmative defense charging Deepwater with fraudulent inducement.[5] Hearing on Deepwater's motion for summary judgment and JHSC's motion to amend its answer was held on July 27, 1988. After extensive oral argument of counsel, the district court took the matter under advisement.

On August 19, 1988, the district court granted Deepwater's motion for summary judgment, denied JHSC's motion to amend

its answer and dismissed its counterclaim. JHSC had apparently filed a counterclaim with its answer wherein it sought an order that it be given a reasonable time to repay Deepwater the $3,600,000 Deepwater had advanced JHSC.

The district court's order granting summary judgment was accompanied by a thirty-eight page memorandum opinion. The gist of this memorandum opinion was that the parties intended to be bound by the interim agreement of May 5, 1987, and that the interim agreement was enforceable because the terms of the contract were established. The district court also found that the interpretation of this contract was a question of law for the court and that specific performance, as opposed to money damages, was warranted. This order also provided that Deepwater would, within sixty days, submit an appropriate order and JHSC would have thirty days thereafter to file any objections. The district court added that, if necessary, it would "schedule a hearing in order to fashion an appropriate decree."

Deepwater submitted a proposed order of specific performance on October 18, 1988. On November 18, 1988, JHSC submitted to the district court its own proposed order of specific performance, supported by a memorandum. On September 26, 1989, the district court entered an order of specific performance which closely paralleled Deepwater's proposed order. JHSC appeals that judgment and order.

■ JHSC takes the basic position that summary judgment was inappropriate. JHSC contends that the May 5 letter was not an enforceable contract between the two business entities. Rather, it was merely an "Interim Agreement" between the parties, both of whom contemplated further discussion on other critical terms of a complex business transaction, with the hope and expectation, that they could agree thereon.

5. JHSC claimed that it had recently ascertained that Deuss had secretly and fraudulently intended to obtain control of JHSC from the outset, although he had disclaimed any desire to acquire control.

Deepwater's position on appeal is that the May 5 letter from McCollister to Deuss constitutes an enforceable contract between Deepwater and JHSC and that specific performance, as opposed to money damages, was appropriate. Our review of this matter convinces us that the issues presented by this rather involved business transaction were not ripe for summary judgment.

The primary issue to be addressed is just how this transaction was to be structured. Paragraph 4 of the May 5 letter provides:

> Prior to the issuance to Buyer [Deepwater] of shares pursuant to paragraph 1, the Company [JHSC] shall sell, or otherwise transfer, to another corporation, the following assets not related to the Jackson Hole Ski Corporation operated by the Company (the mountain operation):
>
> (Paul McCollister to provide description of excluded assets) [6]

Deepwater argues that paragraph 4 of the May 5 letter clearly and unambiguously provides that before issuing JHSC stock to Deepwater in exchange for the $3,600,000, JHSC would sell or transfer its non-ski properties to another corporation.

JHSC argues that to "sell, or otherwise transfer, to another corporation" its non-ski properties to be later identified by McCollister is not clear and unambiguous. In this regard, we note that the term "another corporation" does not in itself exclude another corporation that is a subsidiary. Moreover, paragraph 4 does not identify the precise properties to be transferred.[7] Such identification, under paragraph 4, was to be later made by McCollister. However, paragraph 4 does seem to contemplate that the ski properties would be retained by JHSC and its non-ski properties

transferred to "another corporation," be it a subsidiary or otherwise.

In this same connection, shortly after the May 5 letter, discussion apparently ensued between Deuss, McCollister, and their company lawyers and tax advisers, concerning the possible transfer by JHSC of its ski properties to a subsidiary and its non-ski properties to another subsidiary, with JHSC serving as a holding company for both. Deepwater would then receive stock in the subsidiary acquiring the ski properties. While it is not disputed that such discussions regarding the transaction's structure occurred, Deuss asserts that he did not agree to a subsidiary structure. Conversely, in an affidavit filed in opposition to Deepwater's motion for summary judgment, McCollister stated that, after initially objecting to investing in a subsidiary structure, Deuss nonetheless went on to state, "I don't like it, but I'll do it." McCollister testified to the same effect at the hearing on Deepwater's motion for preliminary injunction.

In any event, Deuss thereafter continued to make installment payments on the $3,600,000 he agreed to invest in JHSC. And in December 1987, after Deuss had completed the payment of $3,600,000 to JHSC, the board of directors of Deepwater approved such investment in Jackson Hole Mountain Corporation, a subsidiary of JHSC.

On appeal, our review of the district court's order granting Deepwater summary judgment and specific performance is *de novo. Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir.1988). In deciding whether there were genuine issues of material fact, we must view the record in a light most favorable to the parties opposing the motion for summary judgment (i.e., JHSC and McCollister). *Baker v. Penn Mutual Life Ins. Co.,* 788 F.2d 650, 653

---

**6.** Apparently, no provision in the May 5 letter permitted Deepwater to challenge or dispute McCollister's description of "excluded assets."

**7.** Although not dispositive in this case, it should be noted that a contract for conveyance of land must be sufficiently certain "to fix and comprehend the property which is the subject of the transaction, so that, with the assistance of exter-

nal evidence, the description, without being contradicted or added to, can be connected with and applied to the very property intended and to the exclusion of all other property." *Noland v. Haywood,* 46 Wyo. 101, 23 P.2d 845, 846 (1933). *See also, Wight v. Linden,* 69 Wyo. 67, 237 P.2d 475 (1951); *Freeburgh v. Lamoureux,* 15 Wyo. 22, 85 P. 1054 (1906).

(10th Cir.1986). When the present record is viewed in a light most favorable to JHSC and McCollister, we believe there were genuine issues of material fact which preclude the granting of summary judgment in favor of Deepwater. In thus concluding, we believe this is not so much an instance where a district judge misunderstood local state law, but rather is a case where the law was misapplied to the facts at hand.

As indicated, a critical matter in this case is how the transaction would be structured. Deepwater argues that under the May 5 letter JHSC was obligated to sell or transfer its non-ski realty to another corporation and to then issue stock in JHSC to Deepwater in exchange for the latter's investment of $3,600,000 in JHSC.

In opposition to Deepwater's position, JHSC points out that in the April 23 and April 24 meetings between Deuss and McCollister there was no discussion, let alone an agreement of any sort, regarding just how this transaction would be structured. The "sell, or otherwise transfer, to another corporation" language first appeared in Deuss' May 1 letter to McCollister. According to McCollister's affidavit in opposition to summary judgment, which was in line with his testimony at the hearing on the motion for preliminary injunction, and also in accord with the affidavit and testimony of McCollister's attorney, there were various discussions between the parties and their attorneys regarding a subsidiary structure subsequent to the May 5th letter. And in June and early July there was further discussion of the matter. Such further discussion, according to McCollister, indicates that the May 5 "Interim Agreement" did not set in concrete, so to speak, all the matters to be resolved by the parties before there was a true meeting of their minds. In any event, the record, viewed in the light most favorable to JHSC, indicates that in early July Deuss agreed to a plan whereby JHSC would transfer its ski operations to one subsidiary and its non-ski real estate to another and then issue Deepwater stock in the ski subsidiary. Deuss, in his deposition, stoutly denies this, but McCollister, in his affidavit and testimony, certainly puts this particular matter in issue.

 Without further belaboring the matter, we do not believe this rather complicated business transaction involving a substantial amount of money was ripe for summary judgment.[8] Certainly, paragraph 4 of the interim agreement, including the "sell, or otherwise transfer, to another corporation" language, is something less than clear and unambiguous.[9] In addition, there are disputes over, or a lack of clarity regarding, other important terms included in the interim agreement such as the adjustment formula, the terms of the voting trust, and shareholder and stock purchase agreements.

 In sum, this case was not ready for summary judgment because genuine issues of material fact exist regarding the

---

8. In this regard, *see Skycom Corp. v. Telstar Corp.*, 813 F.2d 810 (7th Cir.1987) where the Seventh Circuit spoke as follows:

 "When a large-scale corporate transfer is afoot ... the court will respect any evidence that only a formal contract binds; when a simple transaction for the lease of a machine is at issue ... and the more formal agreement appears to be boilerplate, an objective reading of the documents more readily lends to the conclusion that a letter agreement is binding."

9. It should be noted that an agreement between the parties to agree in the future is ordinarily incapable of being enforced because the court cannot supply the terms of the agreement. *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 929 (Wyo.1989); *Action Ads, Inc. v. Judes*, 671 P.2d 309, 310–11 (Wyo.1983).

 It is further noted that on motion for summary judgment, ambiguities are resolved against the moving party, *Houston v. National General Insurance Co.*, 817 F.2d 83, 85 (10th Cir.1987), and an ambiguity may raise a genuine issue of fact sufficient to make summary judgment inappropriate. *United States v. Gammache*, 713 F.2d 588, 594 (10th Cir.1983); *Mari v. Rawlins National Bank of Rawlins*, 794 P.2d 85, 87–88 (Wyo.1990); *Carlson v. Carlson*, 775 P.2d 478, 481 (Wyo.1989). Furthermore, ambiguities in contracts are to be resolved against the draftsman. *Williams Petroleum Co. v. Midland Cooperatives, Inc.*, 539 F.2d 694 (10th Cir.1976); *State v. Pennzoil Co.*, 752 P.2d 975, 979 (Wyo.1988). Although McCollister "drafted" the interim agreement in that he sent the May 5 document to Deuss, the provision in question was lifted verbatim from Deuss's May 1 letter to McCollister.

structure of the transaction. Issues such as whether a contract has been entered into and the terms of the alleged contract are generally questions of fact to be resolved by the fact finder. *Manchester Pipeline Corp. v. Peoples Natural Gas Co.*, 862 F.2d 1439, 1445 (10th Cir.1988).[10] The issues presented should be resolved at trial where the disputed issues of fact can be fully developed and the fact finder can then decide what the true facts really are. By reversing, we are not indicating the ultimate outcome of this controversy, only that it should be decided after trial and not by summary judgment.[11]

Since considerable time has elapsed since the district court made certain interlocutory rulings, those should be re-examined in the light of possible changed circumstances. We refer to the district court's denial of JHSC's motion to amend its answer to include an affirmative defense of fraud, and the district court's *sua sponte* order adding McCollister as a defendant. The order of the district court granting Deepwater a preliminary injunction was not appealed, and so far as we are concerned remains in place.

Judgment reversed.

ALDISERT, Circuit Judge, dissenting.

What divides the panel is whether genuine issues of material fact exist to prevent the proper entry of summary judgment. I find that no genuine issues exist and would affirm the district court's grant of summary judgment.

That I disagree with my brothers of the majority is not to demean their very respectable analysis. This is a summary

judgment matter presenting a close question of whether the appellants have met their factual burden of rebutting the movant's supporting data. It is difficult to decide, in Holmes' phrase, where the axe should fall, because my brothers and I are expressing value judgments.

We are governed by beliefs about facts more than by abstract rules. We derive these beliefs more from practical standards and views about the allocation of competence between judge and jury than by logically determinable or empirically observable data. We are deciding, I suppose, what bubbles—intellectual, philosophical and jurisprudential—are at the moment most in need of pricking.[1]

I gather that the majority hold that there is no dispute concerning the existence of a binding agreement. It would be extremely difficult to hold otherwise because by writing and by oral testimony the appellants have conceded the existence of a binding agreement. In their letter of May 5, 1987, appellants Jackson Hole Ski Corporation and Paul McCollister suggested minor changes to Deepwater Investments' draft of the agreement. They presented the letter as an "interim agreement pending final closing of this transaction." Brief for Appellee at Tab A, p. 1. One of their proposed changes was a paragraph setting forth the governing law: "This Agreement shall be construed in accordance with and the remedies arising from this agreement shall be governed by the laws of the State of Wyoming." *Id.* at 6, ¶ 11. On May 6, 1987, Deepwater agreed to the terms of this interim agreement.

To be sure, additional documents needed to be executed, but the interim agreement

---

**10.** McCollister's so-called "admission" in his cross-examination testimony at the hearing on Deepwater's motion for a preliminary injunction that "the deal was set forth" in the May 5 letter does not in itself resolve the whole case. McCollister also testified that he felt there was a "meeting of the minds to be covered by subsequent documents" and that the May 5 letter, in that sense, was not a final agreement.

**11.** When the terms of a contract are shown without any conflict of evidence, the interpretation of the contract becomes a matter of law. *Engle v. First National Bank of Chugwater*, 590

P.2d 826, 830 (Wyo.1979). However, whether a contract has been entered into depends on the intent of the parties and is a question of fact. *United States through Farmers Home Administration v. Redland*, 695 P.2d 1031, 1036 (Wyo. 1985); *Robert W. Anderson Housewrecking and Excavating, Inc. v. Bd. of Trustee, School Dist. No. 25*, 681 P.2d 1326, 1330 (Wyo.1984).

**1.** The expression is not mine. It is a paraphrase of a statement contained in W. Auden and L. Kronenberger, *The Viking Book of Aphorisms* viii (1981).

expressed a complete meeting of the minds as to the contours of the agreement, as evidenced by McCollister's testimony:

Q. There were to be further documents and a closing and the actual issuance of shares?

A. That's right. Yes, sir.

Q. But you weren't in any doubt that the deal was as set forth in that document?

A. That's correct, sir. That's correct.

Tr. 3/1–2/88, at 76.

Instead, the majority conclude that genuine issues of material fact exist concerning the structure of the transaction: "Certainly, paragraph 4 of the interim agreement, including the 'sell, or otherwise transfer, to another corporation' language, is something less than clear and unambiguous." At 1111–12. I find no lack of clarity whatsoever.

The parties do not dispute that Deepwater would invest only in the ski resort and not in Jackson Hole Ski's other real estate holdings. Those holdings were to be sold to another corporation. There is no ambiguity here.

Jackson Hole Ski and McCollister would like to insert some ambiguity in this case because after receiving $3,600,000 for investment in Jackson Hole Ski, and incidently receiving all the financial benefits from such investment without issuing one share of stock, they discovered that the ski resort would run into a substantial federal tax problem by selling or transferring the non-mountain real estate to another corporation. So they decided to renege on the deal. For the millions they had received for stock in Jackson Hole Ski, they then proposed, contrary to the terms of the agreement, to issue Deepwater shares of stock in a subsidiary they would form. The district court saw through this sham. The agreement provided that Deepwater would receive stock in Jackson Hole Ski and not in a subsidiary. To find ambiguity here, as urged by the appellants, is to concoct it.

The majority also state: "In addition, there are disputes over, or a lack of clarity regarding, other important terms included in the interim agreement such as the adjustment formula, the terms of the voting trust, and shareholder and stock purchase agreements." *Id.* at 1111. On this determination, like my brothers of the majority, I do not argue or explain; I assert.

Certainly, the appellants dispute this material. They fly-speck the record. They want to enjoy the fruits of a multi-million dollar cash infusion into their business without issuing a *single* share of stock, as provided in the agreement, and to prolong the inevitable result of this litigation by proceeding to trial or to blackjack a settlement. But I find no lack of clarity in the terms contained in the written instruments. Nor did the district court.

Any uncertainty in the law governing summary judgment prior to 1986 has been resolved by the U.S. Supreme Court. In its now-famous trilogy, the Court explained that the plain language of Rule 56(c), Fed. R.Civ.P., mandates the entry of summary judgment, after ample time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue of material fact" because the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–57, 106 S.Ct. 2505, 2509–15, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 582–98, 106 S.Ct. 1348, 1353–62, 89 L.Ed.2d 538 (1986). I conclude that there was a complete failure of proof by the appellants in the summary judgment proceedings.

The Court also explained that a dispute about a material fact is "genuine" when the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, no genuine issue of material fact can exist

unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. I conclude there was no genuine dispute here.

What we know as men and women we should not forget as judges. We know what happened here. Paul McCollister needed money to operate his ski resort. He was the one who approached John Deuss, Deepwater's president and controlling shareholder, and persuaded him to invest in the ski resort. But the deal took on strange trappings for a business transaction. It was a stock purchase for a sum certain, but the number of shares to be transferred was subject to a future projection of the ski resort's business. In this respect, the agreement took on the accouterments of a bid for commodities futures. Both sides gambled, but not for dollars and cents. They gambled on what percentage of the resort's capital stock each would control at a later date.

McCollister later discovered two things: First, it was going to cost him a substantial federal tax assessment if he conveyed Jackson Hole Ski's excess real estate to another corporation, as mutually agreed upon in the agreement; and, second, after entering into an enforceable agreement that contained a mechanism that adjusted Deepwater's equity interest in Jackson Hole Ski after five fiscal years, he realized that Deepwater may be entitled to as much as 49 percent of the outstanding shares in Jackson Hole Ski at the end of five years.

Although McCollister got what he bargained for, it was not what he hoped for. But courts enforce legal bargains, not subjective hopes. Like the district court, I would enforce the agreement at the summary judgment stage because Jackson Hole Ski and McCollister have adduced no facts entitling them to a jury verdict at trial. *See id.; see also Continental Ins. v. Page Eng'g Co.*, 783 P.2d 641, 650 (Wyo. 1989) ("The rule is clear that the . . . disposition of disputes relating to [an unambiguous] contract properly may be accomplished by a summary judgment.").

The principals in this high finance drama were not Little League players. They were two professional Sumo wrestlers in a high stakes contest. Now that Deuss has thrown McCollister out of the ring, McCollister wants to climb back in by changing the rules. I would not let him do it.